## OMAHA HORSE RY. CO. *v.* CABLE TRAMWAY CO. OF OMAHA.

*(Circuit Court, D. Nebraska.* March 5, 1887.)

1. RAILROAD COMPANIES—MONOPOLY—HORSE RAILWAY—CABLE.

In 1867, plaintiff company by its charter was given the exclusive horse-railway franchise of Omaha for 50 years. Defendant company, under a city ordinance, consented to by the people in 1884, authorizing it so to do, undertook to lay a cable tramway in Omaha on streets occupied by plaintiff, who sought to enjoin defendant, contending that at the date of its grant "horse railway" meant "street railway," (cable roads being then unknown,) and therefore its grant covered that form of railway communication. The court denied the injunction. *Held* no error, since all grants of franchises belonging to the public being strictly construed against the grantees, *a fortiori* those giving monopolies should be so construed, and courts would not enlarge them by implication.

2. SAME—NEW MODE OF TRANSPORTATION.

*Held, further,* that even if the grant of the "horse-railroad" franchise meant a grant of the "street-railroad" franchise in the contemplation of the parties, yet a grant of a monopoly contemplated was only of such forms of transportation as were then known and in existence, not of such as might subsequently be devised and used.[1]

3. SAME.

Plaintiff's charter prohibited the running of locomotives or cars propelled by steam, or the cars of any other railway company, on its tracks. *Held,* that this had not the disjunctive force of granting to the plaintiff a monopoly of every form of street-railroad transportation except that of cars drawn by engines, but rather is an extra precaution on the part of the legislature to guard against the possibility of a railroad company running its cars over the tracks of the plaintiff.

4. SAME—TOWNS AS TERMINI.

The act of June 7, 1867, giving to certain railroads the exclusive right of laying out and operating a railroad between their *termini,* extending into any town named as terminus, and for a distance of five miles each side of such roads, and at all points between places named as *termini,* repealed in 1871, even if it applied to street railroads, and was of such force that the repeal divested no right that had been acquired thereunder, gave no rights to plaintiffs, since its line was operated within city limits, and not between two cities or towns.

5. SAME—INTERFERENCE OF ROADS—DAMAGES.

Plaintiff was entitled to damages from defendant, not on account of the injury it sustained by reason of the competition, but by reason of defendant's interfering with the ingress and egress of plaintiff's passengers, and defendant's tracks crossing plaintiff's tracks.

This is a bill in equity. The facts are few and simple. The parties are agreed upon most of those that are material.

The plaintiff was incorporated by an act of the legislature of the late territory of Nebraska, with authority to build and operate a horse railway in the streets of the city of Omaha. The act was a special charter, and was approved February 18, 1867. On the twenty-eighth of October, 1868, the city council of Omaha passed an ordinance granting the plaintiff the right to lay out, construct, and operate railways in the streets of the city. The plaintiff entered upon the construction of its works in due time, and has from year to year extended its lines, and it

---

[1] The exclusive right to light a city with gas for 30 years is not legally "impaired" by a subsequent contract with another company to light the streets with electricity. Saginaw Gas-light Co. v. City of Saginaw, 28 Fed. Rep. 529.

now has over 18 miles of road in operation, with the necessary equipments of cars, horses, barns, and other structures. The defendant is organized under the general act of the state legislature entitled "An act to provide for the incorporation of street-railway companies within the cities of this state," approved February 15, 1877. Under the ordinance of the city an election was held in 1884, at which the people gave their consent to the construction and operation by the defendant of its cable tramway in most of the streets of the city, including those on which the plaintiff had then constructed and was operating its lines. The defendant being about to enter upon Tenth street along the plaintiff's line and construct its tramway, to be operated by a cable, this bill was filed, and an injunction sued out. This was dissolved upon condition that the defendant give a bond in the sum of $200,000 to answer to the plaintiff for its damages. This it did, and it has proceeded with its work. The cause is now before the court for hearing on pleadings and proofs. The statutes, upon which the rights of the plaintiff are to be determined, are the following. The first was passed by the last legislature of the territory of Nebraska, on the eighteenth of February, 1867, and is entitled "An act to promote the building of horse railways in the city of Omaha."

"Section 1. Be it enacted by the council and house of representatives of the territory of Nebraska, that Alfred Burley, Ezra Millard, George W. Frost, Joel T. Griffin, J. W. Paddock, C. S. Chase, Geo. M. O'Brien, J. R. Meridith, R. A. Bird, E. B. Chandler, John McCormick, Augustus Kountze, Wm. Ruth, J. Frank Coffman, A. J. Hanscom, and David Butler be, and they are hereby, created and constituted a body corporate and politic by the name of the 'Omaha Horse-railway Company,' with all the power and authority incident to railroad corporations within the territory or under the laws thereof: provided, that the said corporation shall within two years from the granting of this charter have at least one mile of said horse railroad completed and in running order, together with the necessary depots, cars, and all other equipments necessary for the running of the aforesaid road.

"Sec. 2. The said corporation is hereby authorized and empowered to lay out, construct, maintain, and operate a single or double track railway, with all necessary and convenient tracks for turnouts, switches, side tracks, together with all depots and all other appendages as are incident thereto, in the city of Omaha, and in, on, over, and along such street or streets, highway or highways, bridge or bridges, river or rivers, within the present or future limits of the said city of Omaha, or within five miles adjacent thereto, as said company may order or direct, for the use herein specified; but said company shall not build a track through or occupy, except for crossing purposes, Fourteenth street or any other street through which any railroad company has already obtained the right of way; and said company hereby incorporated shall not be liable for the loss of any baggage or package or other articles carried on said railway kept in and under the care of its owner, his or her servant or agent.

"Sec. 3. The capital stock of said corporation shall be one hundred thousand dollars, and may be increased from time to time at the pleasure of the stockholders and directors of said corporation, not to exceed one million dollars. The stock shall be divided into shares of one hundred dollars each, and be issued and transferred in such manner and upon such conditions as the board of directors of said corporation may direct.

"Sec. 4. All the corporate powers of said corporation shall be vested in and exercised by a board of directors and such officers and agents as said

board shall appoint. The first board of directors shall consist of a majority of the corporators herein named, to be elected at their first meeting, and the directors so elected shall hold their office for the term of one year from the time of their election, and until their successors are elected and qualified; and thereafter the stockholders shall select of their number five who shall be directors for the term above stated. The directors may also adopt such by-laws, rules, and regulations for the government of said corporation and the management of its affairs and business as they may think proper, not inconsistent with the laws of this territory.

"Sec. 5. Nothing herein shall authorize the running of locomotives or cars propelled by steam, or to permit the cars of any other railroad company whatever to run along or upon the railway of this company hereby incorporated, and the said corporators, their successors or assigns, shall have the exclusive right for fifty years from the first day of January, A. D. 1867, to build, erect, and operate horse railways within the city of Omaha and five miles adjacent thereto; and the said corporation may purchase, hold, mortgage, and convey real estate for the interest or use of said company, whenever in the opinion of the directors thereof it is deemed advisable or needful so to do: provided, that at the end of fifty years the said roads and depots and other equipments shall revert to the city of Omaha.

"The first meeting of the corporators herein named shall be holden on the first day of May, A. D. 1867, at the Omaha National Bank, in said city of Omaha, and at that time books shall be opened for subscribers to the stock of said company under such regulations as said corporators may establish. This act shall be deemed a public act, and shall take effect and be in force from and after its passage: provided, that the charter may be amended whenever the legislature of the territory of Nebraska shall see proper."

There is also an act, approved February 25, 1875, entitled "An act to encourage the building of street railways in the cities of the state of Nebraska:"

"Be it enacted by the legislature of the state of Nebraska:

"Section 1. That any corporation organized for the purpose of building and operating a street railway in any of the cities of the state of Nebraska, and shall proceed to build and operate said railway within one year from the passage of this act, and shall within such time build and continue to operate at least one mile of such railway, it being the first company so organized for the purpose of building a street railway in the city in which it proposes to operate the same, and shall have the exclusive right for twenty-five years from the date of its organization to build, erect, and operate horse railways within the said city in which the said company have organized to erect and operate the same; and any such corporation shall have power to purchase, hold, mortgage, and convey real estate for the use and benefit of said company.

"Sec. 2. Any company organized, or which may hereafter be organized, and claiming the benefits of this act, shall never, in any case, charge more than five cents per trip for single passengers.

"Sec. 3. This act is not intended to deprive any company as aforesaid of any of its rights, under the general incorporation act of this state, but all the power, franchises, and privileges of whatever kind given by the said act shall be enjoyed in their full extent by any incorporation organized to build and operate a street railway as aforesaid."

On the seventh day of June, 1867, the following act was passed:

"An act to amend section seventy-five of chapter twenty-five, entitled 'Incorporations,' of the Revised Statutes of Nebraska.

"Section 1. Be it enacted by the legislature of Nebraska, that section seventy-five of chapter twenty-five, entitled 'Incorporations,' of the Revised

Statutes of Nebraska, the same being in words and figures as follows, that is to say: 'Sec. 75. Such incorporation shall be authorized and empowered to lay out, locate, construct, furnish, maintain, operate, and enjoy a railroad with single or double track, with such side tracks, turnouts, offices, and depots as shall be necessary between the places of the *termini* of the said road, commencing at or within, and extending to or into, any town, city, or village named as the places of the *termini* of said road, and construct branches from the main line to other towns or places within the limits of this territory,'— be and the same is hereby amended so as to read as follows, that is to say: 'Sec. 75. Such corporation shall be authorized and empowered, and shall have the sole and exclusive right, as hereinafter provided, to lay out, locate, construct, furnish, maintain, operate, and enjoy a railroad. with single or double track, with such side tracks, turnouts, offices, and depots as shall be necessary between the places of the *termini* of said road, commencing at or within, and extending to or into, any town, city, or village named as the place of the *terminus* of said road, and for a distance of five miles on each side parallel with the said road, and at all points between places named as the *termini* thereof.'

"Sec. 2. This act to take effect from the day of its passage."

On the seventh of February, 1871, an act was passed repealing the act last above quoted.

*Geo. E. Prichett, J. M. Woolworth, Thurston & Hall* and *John H. Dillon,* for complainant.

*J. C. Courie,* for defendant.

BREWER, C. J. The initial and important question is whether a cable tramway is within plaintiff's exclusive grant of a right to build, erect, and operate horse railways. If the grant were made to-day it could not seriously be contended that it was so included. There is such a clear and recognized distinction between horse railroads and cable roads that, applying the ordinary rules for the construction of legislative grants, neither kind of road would be included within a grant of the other. The contention, however, is that at the time of this grant cable roads were practically unknown; that the only known form of street railways was the horse railway; that the terms "street railroad" and "horse railroad" were in common parlance used to describe the same thing; that in construing the grant we are to place ourselves back to the time at which it was made, and these terms "horse railroad" and "street railroad" being then used interchangeably for the same thing, we are to suppose that the legislature meant by the use of one term all that it would have meant by the use of the other, and that therefore all that would to-day be included within either term was within the scope of the grant. The rule for the construction of legislative grants is well settled. They are to be construed against the grantee and in favor of the public; and nothing passes unless it is obvious that the intent was that it should pass. I do not mean that they are to be construed technically and narrowly so as to defeat the very purposes of the grant, but that, giving to language its ordinary meaning, nothing will be included unless obviously within the scope of such meaning.

In *Perrine* v. *Chesapeake & Delaware Canal Co.*, 9 How. 172, Chief Justice TANEY says, at page 192:

"The rule of construction in cases of this description is this, that any ambiguity in the terms of the grant must operate against the corporation and in favor of the public; and the corporation can claim nothing that is not clearly given by the law. We do not mean to say that the charter is to receive a strained and unreasonable construction, contrary to the obvious intention of the act. It must be fairly examined and considered, and reasonably and justly expounded."

This rule of construction against the grantee, which applies in all legislative grants, obtains with the greater force in a case like the one at bar, where the grant claimed is not merely the right to do something, but of a right to exclude all the rest of the public from doing that thing. He who says that the state has given him a franchise, a right to do that which without that franchise he could not do, will be compelled to show that the franchise, the right claimed, is within the terms of his grant. Much more strenuous must be the demand upon him for clear and explicit language in his grant when he claims that a part of it is not merely the franchise, the right to do, but also the right to exclude all others of the public from exercising the same right, and the state, as the representative of the public, from according the same right to another. *Jackson Co. Horse Ry. Co.* v. *Rapid Transit Co.*, 24 Fed. Rep. 306; *Proprietors, etc.,* v. *Wheeley,* 2 Barn. & Adol. 793. See, also, *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 422, in which Mr. Chief Justice TANEY, speaking for the court, uses this language:

"Is there anything in our local situation, or in the nature of our political institutions, which should lead us to depart from the principle where corporations are concerned? Are we to apply to acts of incorporation a rule of construction differing from that of the English law, and by implication make the terms of a charter in one of the states more unfavorable to the public than upon an act of parliament framed in the same words would be sanctioned in an English court? * * * We think not; and it would present a singular spectacle if, while the courts in England are restraining within the strictest limits the spirit of monopoly, and exclusive privileges in the nature of monopolies, and confining corporations to the privileges plainly given to them in their charter, the courts of this country should be found enlarging these privileges by implication, and construing a statute more unfavorably to the public and the rights of the community than would be done in a like case in an English court of justice."

Now, placing ourselves back at the time of this grant, what should be attributed to the legislature as its intent? It may be assumed that the only form of street railway in practical use was the horse railway, and that in common parlance the two terms were often used interchangeably. Is it probable that it intended to foreclose the public in advance from all the benefits of possible inventions and discoveries in the matter of street railway travel, and give them to this grantee? or did it not rather intend that its grantee should take that complete and single thing known as a horse railway, with all of which it was familiar, and retain for the public all of the unknown possibilities of invention and discovery in reference to modes of street railway travel? Did it intend to give that which it knew nothing of or only that which it knew? It seems to me that the mere stating of the question suggests the inevitable answer. Indeed, assuming the con-

ditions to be all as stated, if the legislature had used the words "street railway," instead of the term "horse railway," a very pertinent question would arise whether it intended to grant an exclusive right to any other than that form of street railway, to-wit, horse railway, with which it was familiar. We are bound to assume that the legislature is dealing with the known and not with the unknown, and that when it grants a franchise it only intends to grant that of which it has knowledge; and it is unreasonable to lay stress on the form of language or the words used for the sake of broadening an intent so as to include things not then known. A case most apt and pertinent to this line of thought is that of *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116. In that case the legislature of New Jersey had given the plaintiff the right to build a toll-bridge, with a provision that no other bridge should be built within certain limits for a period of 99 years. Subsequently the defendant, within the time limited, was proceeding to construct a railroad bridge within the prescribed limits, and this construction was sought to be enjoined by the plaintiffs as an invasion of their franchise. The court of errors and appeals of New Jersey denied the injunction, and on appeal to the supreme court of the United States its ruling was affirmed. In the opinion of the court, Mr. Justice MILLER uses this language:

"It does not follow that when a newly-invented or discovered thing is called by some familiar word which comes nearest to expressing the new idea, that the thing so styled is really the thing formerly meant by the familar word. Matters most intimately connected with the immediate subject of our discussion may well illustrate this. The track on which the steam cars now transport the traveler or his property is called a road, sometimes, perhaps generally, a railroad. The term 'road' is applied to it, no doubt, because in some sense it is used for the same purpose that roads had been used. But until the thing was made and seen no imagination, even the most fertile, could have pictured it from any previous use of the word 'road.' So we call the inclosure in which passengers travel on a railroad, a coach; but it is more like a house than a coach, and is less like a coach than are several other vehicles which are rarely if ever called coaches. It does not therefore follow that when a word was used in a statute or contract seventy years since, that it must be held to include everything to which the same word is applied at the present day. For instance, if a Philadelphia manufacturer had agreed with a company seventy years ago to furnish all the coaches which might be necessary to transport passengers between that city and Baltimore for a hundred years, would he now be required by his contract to build railroad coaches? or, if a company had then contracted with the government to build and keep up good and sufficient roads to accommodate mails and passengers between those points, for the same time, would that company be bound to build railroads under that contract? Yet the structure which the defendants propose to build over the Hackensack is not more like a bridge of the olden time than a railroad is like one of its roads, or a railroad coach is like one of its coaches. It is not then a necessary inference that because the word 'bridge' may now be applied by common usage to the structure of the defendants, that it was therefore the thing intended by the act of 1790."

In other words, as a railroad bridge was unknown at the time of the grant, the supreme court held that it was not included within the exclusive franchise; it was something not thought of by the legislature, and

was therefore not within the limits of the exclusive grant. That case is even stronger than this, for a railroad bridge is certainly one form of a bridge, and therefore within the very letter of the grant, but a cable road is not one form of a horse railroad, and not within the strict words of the grant. *Bridge Co.* v. *Railroad Co.*, 6 Paige, 564; *Thompson* v. *Railroad Co.*, 3 Sandf. Ch. 625; *McRee* v. *Railroad Co.*, 2 Jones, Law, 186; *Saginaw Gas-light Co.* v. *Saginaw*, 28 Fed. Rep. 529.

Even in a case in which the rigorous rule of construction of grants does not apply, and suppose the term "horse railway" had been used in an ordinary contract between private parties at the date of this grant, it is very doubtful whether that term would be construed as intending anything more than what is now known as technically and strictly a horse railway. Suppose some individual had contracted with this plaintiff immediately after this grant to construct tracks for its cars during the entire life-time of the grant, at so much per lineal yard, would that contract be held to bind him to the construction of the more expensive track of the cable tramway? I think it would be difficult to answer this question in the affirmative, and for the obvious reason that that which is not within the thought of the parties is not within the scope of the contract. A cable road is not more different from a horse railroad than a steam railway is from an electric railway, and yet would it be seriously contended that, if at the date of this grant the plaintiff had received a like grant of an exclusive right to construct and operate a steam railroad between Omaha and Lincoln, that exclusive right would prevent the construction of an electric railway between the two places? Would a grant to construct even a street railway carry with it the right to construct and operate an elevated road?

My conclusion from these considerations is that the term "horse railway" was not used in this grant as significant of any other form of street railway than that which is now known, strictly speaking, as a horse railroad; nor is this conclusion shaken by the argument made by plaintiff as to the inference from the two provisions in the charter prohibiting the running of locomotives or cars propelled by steam, or the cars of any other railroad company, on the tracks of plaintiff. These two prohibitions are part of one sentence; and it seems to me all that can be inferred from them is an extra precaution on the part of the legislature to guard against the possibility of the Union Pacific Railway Company, or any other railway company, running its cars over the tracks of plaintiff. It has not the disjunctive force of granting to the plaintiff a monopoly of every form of street-railroad transportation except that of cars drawn by engines. Further, it is worthy of notice that the title of the act giving plaintiff its charter, which may be presumed to express somewhat the intent of the legislature, is that of "An act to promote the building of horse railways," etc. This seems to intensify and strengthen the argument heretofore made as to the intent of the legislature; for can it be that the legislature intended to promote all speculative enterprises in street railway travel by giving the exclusive franchise thereof when as yet nothing was known as to the possibilities of improvement? I think I need

add nothing more on this branch of the case. Of course the conclusion thus reached makes equally against any claim of the plaintiff under the act of 1875, for horse railways are all for which any exclusive right is given under that act.

I think little need be said as to the claim made under the act of June 7, 1867; for, even if it be conceded that the grant of the plaintiff of all the power and authority incident to railroad corporations within the territory or under the laws thereof gave them any other right or privilege than was then given to railroad corporations by the laws of the territory, and that it operated as a float to grasp every right, franchise, and privilege that might be given to railroad corporations by any law during the life-time of the plaintiff; and, further, that it was of such potency that, having once seized upon such right or privilege, it held it in its grasp notwithstanding the repeal of the act, giving it to ordinary railroad corporations,—yet by it nothing was appropriated by the plaintiff except that which was germane and pertinent to its existence and its functions. Now, obviously section 75, quoted *supra*, has application simply to railroads between two cities or towns, and not to any ordinary street railroad within city limits; it speaks of the places named as *termini*, and excludes rival roads parallel with the one road for a distance of five miles on each side. Obviously this is a provision which has no application or pertinency to a mere street railroad within a city. This conclusion disposes of the principal question in the case, and compels me to deny the claim of the plaintiff to an exclusive right to all street railroads in the city of Omaha, and an absolute injunction against the defendant.

A further question is made under section 21 of the bill of rights of the constitution of 1875, which reads: "The property of no person shall be taken or damaged for public use without just compensation therefor." I had occasion, in the recent case of *McElroy* v. *City of Kansas*, 21 Fed. Rep. 257, to consider the scope of a constitutional provision of this nature, and I need add nothing here to what was then said. I have no doubt of its application, and I think that the plaintiff shows a case which calls for the enforcement of that provision. But I do not agree with plaintiff in its contention that, because of this provision and its application to the case at bar, an absolute injunction should go. The Nebraska constitution differs from that of Missouri in this: that the latter provides that no appropriation or entry shall be allowed until such compensation has been paid, while the former ends with the simple provision requiring compensation. The premises which are occupied, to-wit, the streets of Omaha, are premises within the control of the state; and, when the state authorizes their occupation, the fact that damage may ensue to some individual property does not justify an absolute injunction. All that the courts may fairly do is to compel payment of such damages, and to restrain occupation of the streets until or unless such damages are paid.

My Brother DUNDY wisely, as I think, dissolved the temporary injunction on the defendants giving a bond in the sum of $200,000 to answer for all damages done to the plaintiff. How should those damages

be ascertained? The court might doubtless send the matter to a jury, or permit the plaintiff to maintain an ordinary action at law, holding this case to abide the result of that action, or it may appoint commissioners to assess those damages. I think the latter the true method,—one most likely to result in awarding full compensation to the plaintiff, which, of course, it is entitled to receive. I do not mean that the plaintiff is entitled to compensation for any injury which may result from the mere fact of competition, but there are at least two matters which are clearly proper matters of consideration in estimating the plaintiff's damages: *First*, the inconvenience and annoyance which results from the crossing of plaintiff's tracks by the track of the defendant; *second*, the interruption of access to plaintiff's cars by the track and cars of defendant between its track and the sidewalk. Perhaps there may be other matters, but I do not now attempt to determine. I think the matter of damages should be referred to a commission of three gentlemen, one of whom should be a man of experience in the operation of street railroads, one a civil engineer, and the other, so to speak, a representative of the public,—some business man of the city of Omaha.

The decree, therefore, which will be entered, will be for the appointment of such a commission to ascertain and report the damages sustained by the plaintiff, and continuing the case for further order and final decree until after the report of such commission.