### WESTINGHOUSE ELECTRIC & MFG. CO. v. BINGHAMTON RY. CO.

(District Court, N. D. New York. January 22, 1919.)

1. STREET RAILROADS ⚫⇒58—RECEIVERS—OPERATION OF ROAD.
    Under Judicial Code, § 65 (Comp. St. § 1047), it is the duty of a receiver of a street railroad to operate the same according to the valid laws of the state in which the road is situated.

2. CARRIERS ⚫⇒18(1)—RATES—POWER OF COURTS.
    The Legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates.

3. CARRIERS ⚫⇒12(9)—RATES—PUBLIC SERVICE COMMISSION.
    In New York the Public Service Commission has, under Public Service Commission Law, §§ 33, 48, 49, power to increase or change rates of fare; but this power does not exist, where there is a valid contract between a municipality and a street railroad company fixing the rates of fare.

4. STREET RAILROADS ⚫⇒58—RECEIVERSHIP—POWER OF COURT.
    Where a receiver of the property of a street railroad company in failing circumstances is appointed, the court has the equitable power to restrain suits which would hamper the operation of the road, and, if necessary, may order a sale of the property and distribution of the assets.

---

⚫⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. RECEIVERS ⊙81—NATURE OF RECEIVERSHIP.

A receivership is for the benefit and protection of all interests.

6. STREET RAILROADS ⊙58—RECEIVERSHIP—RESTRAINING FORECLOSURE OF MORTGAGE.

The existence of a receivership does not warrant the court restraining an action to foreclose a mortgage securing bonds on the property of a street railroad company in the hands of a receiver, where interest is in default, and the court has no power to issue receiver's certificates to pay such interest, and make same a lien superior to the mortgage.

7. CARRIERS ⊙12(5)—FARE—RATES.

Existing conditions *held* to show necessity for increasing the rates of fare of a street railroad company in the hands of a receiver.

8. CONTRACTS ⊙15—CREATION—VALIDITY.

Contracts, to be valid and binding, when not implied by law from the existence of certain conditions, result from the mutual agreement of the parties to be bound thereby, or, in other words, the meeting of the minds.

9. CONTRACTS ⊙105—CREATION—VALIDITY.

There can be no valid agreement to violate a law, but private legal obligations imposed by statute may be varied by an agreement which is not forbidden by law, or which is not in violation of the spirit of the law.

10. CONTRACTS ⊙161—CONSTRUCTION.

All the terms and conditions of a contract are to be read together, and each provision construed with reference to the others.

11. CONTRACTS ⊙247—ALTERATION—PRESUMPTION.

The parties by mutual consent properly evidenced may take out of a contract one provision and substitute another, etc., but as a general rule it is never implied that one party assents to a change which materially affects his rights or remedies and creates new obligations and substitutes nothing.

12. CONTRACTS ⊙249—DISCHARGE.

A contract may be discharged by performance, by operation of law or by express agreement called waiver, cancellation, or rescission.

13. CARRIERS ⊙12(9)—CHARGES—CONTRACTS.

Where municipal ordinances provided that street railroads should be operated by animal power and the fare should not exceed 5 cents, consent by the municipality to electrification of the roads *held* to work cancellation of the contract as to fare.

14. CARRIERS ⊙12(9)—FARE—CONSENT OF MUNICIPALITY.

Though Laws N. Y. 1884, c. 252, relating to street railroads, provided for consent of municipal authorities, yet as the act itself, by fixing the rate of fare, showed a legislative exercise of the rate-making power, the consent did not create any contract between the municipality and the street railroad company, restricting the latter to the rate of fare prescribed in the act.

15. CARRIERS ⊙12(9)—FARE—RATE-MAKING POWER.

Where a state Legislature proceeds to exercise its power to fix rates for a street railroad company, such company and a municipality cannot contract as to the matter, for, when the state or nation proceeds to act as to matter which it has power to regulate, private contracts as to such matter are no longer binding.

16. CARRIERS ⊙12(9)—RATES—REGULATION.

In view of the history of legislation and Railroad Law, art. 5, *held*, that the rate of fare to be charged by a consolidated street railway company, to which a city had granted the right to build extensions, was subject to regulation by the state; any contract with the city having been abrogated.

⊙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**17. CARRIERS ☞12(9)—RATES—REGULATION.**

Where the state exercised its power to regulate rates charged by a street railroad company, *held*, that the fact a municipality thereafter contracted as to existing rates does not preclude the state from altering the rates.

**18. COURTS ☞366(1)—PRECEDENTS—STATE DECISIONS.**

Interpretation of a state statute by the highest court of the state enacting it is binding on the federal courts, including the national Supreme Court, where there is no infringement of the United States Constitution, except when the Supreme Court has first passed on the matter.

**19. CARRIERS ☞12(9)—RATES—REGULATION.**

The New York Public Service Commissions Law does not allow the Public Service Commission to regulate the rates of a street railroad company, where there is a valid contract between such company and a municipality as to such rates.

**20. CARRIERS ☞12(5)—RATES—CONFISCATORY.**

A rate limiting a street railroad company to a 5-cent charge per passenger *held* confiscatory.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Binghamton Railway Company, in which William T. Phelps was appointed receiver. In the matter of the application of the receiver for an order authorizing and directing him to increase the rates of fare for carrying passengers on defendant's road from the present rate of 5 cents to 7 cents, and to apply to the Public Service Commission of the Second District of New York for a determination by it as to the reasonableness of such increased rate, and for such other and further order, decree, or direction in the premises as the court may deem proper. Application granted.

This is an application made by William G. Phelps, as receiver of the Binghamton Railway Company, for permission and direction to apply to the Public Service Commission of the Second District of the State of New York, for an order authorizing an increase in the rates of fare for carrying passengers on said railway, such increased rate to continue during the war in which the United States is now engaged, and for two years thereafter. Before such direction should be given to the receiver by this court, it is necessary to determine three propositions, to wit:

First. Does there exist a contract between the city of Binghamton and the defendant company which precludes the Public Service Commission from authorizing an increase in the rate of fare?

Second. Are all of the corporations, which have by mergers or consolidations become the Binghamton Railway Company, subject to the provisions of the general street railroad laws of the state of New York?

Third. Has the Public Service Commission, upon the application of the receiver under the direction of the court, power to authorize an increase in rates?

Geo. B. Curtiss, of Curtiss, Keenan & Tuthill, of Binghamton, N. Y., for receiver.

John J. Irving and Wm. H. Riley, both of Binghamton, N. Y., for city of Binghamton.

Jas. E. Connerton, of Johnson City, N. Y., for village of Johnson City.

E. H. Moody and D. V. Ashley, both of Binghamton, N. Y., for town of Union.

RAY, District Judge (after stating the facts as above).   The Binghamton Railway Company, owning and operating a surface street railway, extends through certain of the streets of the city of Binghamton, N. Y., and also to points outside of said city, and is made up of an original company and several other companies, subsequently organized and thereafter consolidated therewith.   It is the only line of street railway in or near the city of Binghamton, and extends to the village of Lestershire, Johnson City, and the village of Union, and also to the State Asylum for the Insane and to Port Dickinson.

Owing to the war and war conditions mainly, if not wholly, the present rate of fare charged, five cents, has proved to be wholly inadequate to the production of revenues sufficient for the maintenance of the road; that is, payment of running and operating expenses, taxes, and the interest due on its bonded indebtedness, excluding all consideration of dividends to stockholders, and even the purchase of new and needed equipment, or the making of contemplated and needed extensions and improvements, which would be of benefit, not only to the company itself, but to the public.

The maintenance and continual operation of this road is a matter of concern, not to its stockholders alone, but to the general public and every resident of the city of Binghamton and of the communities named and to which the road reaches.   This financial condition of this corporation is not due to any financial or business mismanagement, or to ill-considered or unnecessary outlays, or to excessive salaries paid to officers or managers, or to the payment of dividends to stockholders, but to the rapid and unforeseen increase in the cost of material, especially iron and steel, and other equipment, and the cost of labor absolutely essential to the operation of the road and the keeping of same in even ordinary repair, consistent with the safety of those riding thereon.   The cost of labor and material, in most cases, has more than doubled, and in some cases is three or four times what it was formerly.

The company found itself without revenues to pay overdue taxes, bills overdue for necessary supplies purchased and used for needed repairs, current expenses, and cars purchased, but not paid for, saying nothing of interest on its bonded indebtedness falling due in the immediate future.   It had borrowed to the limit of wisdom, if not to that of possibility.   It found itself threatened with suits to which it had no defense, executions and levies on its personal property, cars, and other equipment, which would render operation impossible, and with default in payment of interest on its outstanding bonds and a foreclosure of the mortgages given to secure same and a sale of its property.

With this situation confronting it, a suit in equity was brought by one of its large creditors, in which this court was called upon to appoint a receiver of the company and of its property, whose duty it should be to protect and preserve the property as a going concern and operate the road for the benefit of all concerned, applying the earnings to the payment of necessary current expenses.   An able business man, not connected with any interest, was selected by the court and appointed to this place.   There was no objection to his selection.

The court has found it necessary to authorize the issue and sale of receiver's certificates to provide for overdue taxes and other expenses, and has taken considerable evidence in this proceeding establishing all the facts stated on a full hearing and on due notice to all concerned, and in which counsel for the city of Binghamton and the other places named have been heard.

This application, as before stated, was and is directed to this court for authority and direction to the receiver, William G. Phelps, to apply to the Public Service Commission of the State of New York, Second Division, for authority to increase the rate of fare charged on this road from 5 cents per trip to 7 cents per trip, or to such sum as the court may recommend and the Public Service Commission may approve and grant. It is not sought to have this increase permanent, but for the period of the war, soon to close finally, and for the two years following, when it is expected conditions will be more normal. It is doubted and denied by some that the said Public Service Commission possesses such power in this case, and this court has taken proof of all the pertinent facts to enable it to determine whether or not, in its opinion, such power exists, and whether or not the facts demand the exercise of such power, if it does exist, to the end that said receiver, who is but the arm of the court, may be directed to incur the expense of a proper application to that commission invoking its action.

### Necessity.

[1] The necessity for the invocation of such power, if it exists in this case, is beyond all question. This court is without power in any case or under any circumstances to increase rates of fare, or direct its receiver so to do, even while in possession of and operating the road for the benefit of the public who use it. The court cannot do this, even when to run at the present established rates entails large losses to creditors and stockholders. The statutes of the United States provide that:

"Whenever in any cause pending in any court of the United States there shall be a receiver or manager in possession of any property, such receiver or manager shall manage and operate such property according to the requirements of the valid laws of the state in which such property shall be situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. Any receiver or manager who shall willfully violate any provision of this section shall be fined not more than three thousand dollars, or imprisoned not more than one year, or both." Comp. St. § 1047.

It is the duty of a receiver appointed by the federal court to operate the railroad according to the valid laws of the state in which such road is situated. Erb v. Morasch, 177 U. S. 584, 585, 20 Sup. Ct. 819, 44 L. Ed. 897; United States v. Harris, 177 U. S. 305, 20 Sup. Ct. 609, 44 L. Ed. 780; Act Aug. 13, 1888, c. 886, § 3, 25 Stat. 433, 436, 1 U. S. Comp. St., p. 1184, § 1047; Judicial Code, § 65. In Erb v. Morasch, supra, it is said:

"Now, in respect to the federal questions, we remark, first, that it is the duty of a receiver, appointed by a federal court to take charge of a railroad, to operate such road according to the laws of the state in which it is situated.

Act Aug. 13, 1888, c. 866, § 2, 25 Stat. 433, 436; United States v. Harris, ante, 305 [20 Sup. Ct. 609, 44 L. Ed. 780]."

[2] In Chicago & Grant Trunk Railway v. Wellman, 143 U. S. 339, 344, 12 Sup. Ct. 400, 402 (36 L. Ed. 176), the court said:

"The Legislature has power to fix rates, and the extent of judicial interference is protection against unreasonable rates."

To the same effect is Stone v. Farmers' Loan & Trust Co., 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Chicago, Milwaukee, etc., Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970.

[3] In the state of New York the Public Service Commission is to increase or change rates of fare. Public Service Commissions Law, §§ 33, 48, 49. Section 49, amended by chapter 546, Laws of 1911, provides:

"Whenever either commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of persons or property within the state, or that the regulations or practices of such common carrier, railroad corporation or street railroad corporation affecting such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in anywise in violation of any provision of law, or that the maximum rates, fares or charges, chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore authorized by statute, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed."

See People ex rel. U. & D. R. Co. v. Public Service Commission, 171 App. Div. 607, 156 N. Y. Supp. 1065, affirmed 218 N. Y. 643, 112 N. E. 1071.

[4] This power of the court does not exist, however, in cases where there is a valid contract in force fixing the rates between the municipality and the railroad company. Such contracts cannot be disregarded or overthrown by the action of the court. Detroit v. Detroit C. S. R. Co., 184 U. S. 368, 382, 22 Sup. Ct. 410, 46 L. Ed. 592; Matter of Quimby v. Public Service Commission, 223 N. Y. 244, 263, 119 N. E. 433. This is admitted or not questioned by the receiver in this case, but he denies the existence of such a contract. The court, however, in such cases as this, has the equitable power to restrain suits which would hamper the operation of the road, inconvenience the public, waste the assets, and destroy the value of the stock and road. It may, if necessary, order a sale of the property and the distribution of the proceeds to creditors, balance, if any, to stockholders. It is immaterial whether we term such equitable suit one in the nature of a sequestration proceeding or one in the nature of a conserva-

tion of assets proceeding; the end sought to be attained is the same, and the powers of the court in the premises are substantially the same. The only denial of the necessity for an increase of rate of fare on this railroad is found in the argument that the war with the German Empire and Austria is substantially over, and that the soldiers are rapidly returning home and to their accustomed avocations, and that reasonably it may be expected that business and industrial conditions will speedily assume or regain the normal, and that all necessity for an increase in the rate of fare will soon disappear, and also that this railroad company, as individuals and private corporations have done, should be willing to submit uncomplainingly and cheerfully to the losses growing out of war conditions.

This assumes that the financial ruin of this railroad company is not impending, and the foreclosure of the mortgages thereon and the "wiping out" of the stock held by the stockholders and large losses to general creditors are not imminent. It is within the knowledge of the court that already preparations are being made and steps taken to bring about a foreclosure of the mortgages, or at least one of them, on this road, and a sale of the property. Such action would destroy the value of the stock and result in large losses to the general creditors (unless it be certain preferred ones, whose claims may be preferred to the lien of the mortgage bondholders). The court is also informed, and has no reason to doubt, that it is not the desire of such interests to avail themselves of such foreclosure remedy, if it can be avoided without sacrificing the rights of the mortgage bondholders.

In the judgment of this court the true interests of the city of Binghamton and of the villages to and through which this railroad runs demand that action which probably would lead to the results indicated should be avoided, and that affirmative action should be taken if it reasonably can be done, which will make such results impossible. Every failure of a substantial character in almost any community is a blow to its financial and industrial prosperity. Sales of such properties as this, under present financial conditions, are sure to result in a great sacrifice by those who in good faith have put their money into the stock of the companies and those who in good faith have given credit without security, depending on their continued prosperity and ability to pay from current revenues. It would seem that those who use this road as a great public utility and convenience, and every interest in the city of Binghamton and the villages concerned, should be willing to pay temporarily an increased rate of fare for this service commensurate with its actual cost and the increased rate of wages paid to all workers, including those who operate the road, and by and to those industrial and manufacturing concerns which make and sell the iron, steel, and equipment necessary for the operation of this road. Adequate rates of fare under conditions prevailing prior to the war are inadequate under prevailing conditions, and those who enjoy the benefits of the service ought to be willing to pay a fair compensation therefor. It may be remarked, without digressing too far, that in several instances the rates of fare on similar lines of roads have been increased.

[5-7] A receivership is for the benefit and protection of all interests, general creditors, secured creditors (bondholders), and stockholders, and it is the duty of the court, so far as reasonably possible, to conserve and protect all interests. The court should not and cannot properly hold and manage such a property indefinitely. There must be revenues, not only to pay taxes, but to pay current operating expenses and current and necessary repairs; also to pay interest on bonds accruing, due and secured by mortgage, and which must be paid to prevent the trustee under such mortgages from declaring a default and proceeding to foreclose. This court has no power to enjoin such action by the trustee under a valid mortgage given to secure the payment of bonds. It has no power to issue receiver's certificates to raise money to pay such interest on bonds, and make the indebtedness thus created a first lien after operating expenses and taxes; that is, a lien prior to the lien of bonds themselves.

In Knickerbocker T. Co. v. O. C. & R. S. Ry. Co., 201 N. Y. 379, 385, 386, 94 N. E. 871, 873, the Court of Appeals, per Mr. Justice Cullen, after citing and quoting from the decisions of the Supreme Court of the United States, and speaking of receiver's certificates, said:

"It thus appears that the power is merely incidental to the possession by the court of some property or fund, and can be exercised only for the care, maintenance, and preservation of such property or fund, and not for the benefit or advantage of any particular claimant to the fund, except as such claimant may profit by the maintenance and preservation of the thing itself. The res or thing in the possession of the court in this case by its receiver was the railroad. Receiver's certificates might have been issued for the maintenance and preservation of the railroad, for its repair, the purchase of necessary rolling stock, and the payment of taxes under which the rolling stock might be seized and the operation of the road crippled or prevented. Had the application been made to issue certificates for any of such purposes, and the trustee given notice, it is probable that it would have been concluded by the determination of the court on the necessity of issuing certificates. The order made in this case, however, showed on its face that the certificates were to be issued for no such object, but to prevent the foreclosure and loss to the stockholders and creditors of the railroad. Probably payment of the defaulted interest and avoidance of a foreclosure would benefit the stockholders and creditors of the company, and so, also, would the issue of certificates, the proceeds thereof to be paid to creditors, benefit the creditors; but neither would benefit or enhance the value of the railroad, or save it from depreciation to the extent of a dollar, and the railroad was the only res in court. Nor would it contribute at all to the proper operation of the railroad, the thing in which the public was interested. The effect of the order was simply to pay bondholders by appropriating against their will part of their own property for the purpose. The order of the court was, therefore, not only erroneous, but void as in excess of its powers; and though the court in granting the order necessarily decided that it was within its powers, still the order may be attacked collaterally. Kamp v. Kamp, supra [59 N. Y. 212]. Persons purchasing the receiver's certificates were bound to take notice of his authority to issue the same as a paramount lien. Union Trust Co. v. Illinois Midland Ry. Co., supra [117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963]."

Therefore it is plain that to protect and preserve this railroad the receiver must depend on revenues and not on borrowing, and also that its protection depends on ability to pay the interest on its bonds as well as the operating expenses. This receiver cannot depend on

the good nature of bondholders, who expect their interest, and many of whom need it to meet living expenses, but under the circumstances of this case must and should appeal to that power, if there be one, which can authorize an increase in rate of fare and thereby secure the revenue absolutely essential to accomplish the main purpose for which he was appointed, viz. conserve and preserve this corporation and its property for the benefit of creditors, secured and unsecured, the general public who use it and the stockholders.

### Alleged Contract.

Is there subsisting such a valid contract between this railroad company and the city of Binghamton, or between it and any or all of the villages concerned, as deprives the Public Service Commission of power to increase or authorize the increase of the rate of fare on the road above 5 cents? The answer to this question involves the decision of the other question: Are or were the other companies, consolidated to form the Binghamton Railway Company, this defendant, subject to the provisions of the general railway law of the state of New York?

The proper determination of these questions makes necessary an examination of the several charters of the several roads so consolidated, of the ordinances and consents under and pursuant to which they were created and entered on the streets of Binghamton, and of the subsequent ordinances, as well as of the laws of the state applicable to the situation, enacted from time to time since. From a small beginning, the creation of the Binghamton & Port Dickinson Railroad Company under and pursuant to a special act of the Legislature of the state of New York, passed May 1, 1868 (chapter 501, Laws of N. Y. 1868), operating on Main, Court, and Chenango streets, and also extending outside the city, the present road, Binghamton Railway Company, has come into existence by means of the organization, creation, extension, and consolidation of other roads, by authorization of laws duly enacted, and now covers about 52 or more miles of track. The city of Binghamton has increased in population from about 12,000 in 1868 to some 60,000 in 1918, and its business, manufacturing, and wealth have increased in proportion. The original lines, as authorized, conducted, and operated, with one or two unimportant exceptions, were operated by horse and mule power, and were limited by law or consents to the use of that motive power. This is important, as bearing on the effect of subsequent consents and ordinances of the city, and in determining whether or not subsequent consents and ordinances, changing motive power, did away with certain limitations contained in the original consents as to rates of fare authorized.

### Binghamton & Port Dickinson.

The act creating the Binghamton & Port Dickinson Railroad Company contained the following:

"And the said company or their assigns shall be authorized to charge, collect and receive from each passenger for riding any distance upon said road not to exceed five cents a mile."

And also the following:

"The cars to be used on said railroad shall be drawn by animal power."

The act prohibited all persons from constructing or operating any other railroad upon or along said streets or any of them. This act made it mandatory on the local authorities to give their consent to the construction and operation of this road, and they did so; such consents containing no restrictions.

By agreement dated February, 1901, between the village of Lestershire, now Johnson City, and the railroad company, the rate of fare was restricted to 5 cents for riding any distance on this line but by a subsequent agreement of August 17, 1918, the provisions of that agreement were duly suspended during the continuance of the war and for two years thereafter, so this application could be made to the Public Service Commission, and neither Johnson City nor the village of Port Dickinson raise any question as to the power of such commission to authorize an increase of rate of fare on this line of road. In 1890 the limits of the city of Binghamton were extended, so as to include within its present boundaries all of the town of Binghamton upon the highways of which this road was built and operated, except the village of Port Dickinson.

### Washington Street & State Asylum.

The Washington Street & State Asylum Railroad Company was incorporated on the 23d day of October, 1871, under and pursuant to the Railroad Law of 1850, being chapter 140, Laws of New York 1850. Section 28 of that act (repealed in 1890 [Laws 1890, c. 565]) defined the grant of powers, and subdivision 9 conferred the power to fix the compensation for transportation of passengers, but limited it to three cents per mile, and subdivision 5 of that section contained the following:

"Nothing in this act contained shall be construed to * * * authorize the construction of any railroad, not already located in, upon, or across any streets in any city, without the assent of the corporation of such city."

Section 33 of that act provided that:

"The Legislature may, when any such railroad shall be opened for use, from time to time, alter or reduce the rate of freight, fare, or other profits, * * * but the same shall not, without the consent of the corporation, be so reduced as to produce, with said profits, less than ten per centum per annum on the capital actually expended."

That act is silent as to the imposition of any condition as to rates of fare by the city on giving its assent to the use of its streets.

### Park Avenue Railroad Company.

May 6, 1882, the Park Avenue Railroad Company was incorporated under the said act of 1850.

### Binghamton Central Railroad Company.

March 7, 1883, the Binghamton Central Railroad Company was incorporated under said act of 1850.

## City Railway Company.

December 22, 1883, the City Railway Company was incorporated under the same act of 1850.

It is seen that the Washington Street & State Asylum, the Park Avenue, the Binghamton Central, and the City Railway Companies were incorporated under the same General Railroad Law, the act of 1850, and that each had the same rights and privileges and was subject to the same obligations then imposed by the act of 1850, unless in some way changed or qualified by the consents given as a condition of occupying the streets of the city.

## Court Street & East End Railroad Company.

In March, 1886, the Court Street & East End Railroad Company was organized under and pursuant to the law of May 6, 1884 (chapter 252). This act provided for the construction, etc., of street surface railroads exclusively. In section 1 this act provided that:

"Such corporation shall also have all the powers and privileges granted, and be subject to all the liabilities imposed, by this act and by the act entitled 'An act to authorize the formation of railroad corporations, and to regulate the same,' passed April 2, 1850, and the several acts amendatory thereof, except as the said acts are herein modified."

### Section 3 of this act provided as follows:

"Any company organized as aforesaid, or any existing street surface railroad company or corporation heretofore organized for the purpose of building and operating a street railroad, may construct, maintain, operate, use and extend a railroad or branches on the surface of the soil, through, upon and along any of the streets, avenues, roads or highways of such cities, towns and villages, and also through, along and upon any private property which said company may acquire for the purpose, and may also construct such switches, sidings, turnouts and turntables and suitable stands as may be necessary for the convenient working of such road, provided that the consent in writing of the owners of one-half in value of the property bounded on, and the consent also of the local authorities having control of that portion of a street or highway upon which it is proposed to construct or operate such railroad be after the passage of this act first obtained."

Section 9 contained the following reservation or grant of power to the local authorities of a city or village as to the enactment of ordinances, viz.:

"The local authorities having charge of streets, avenues, roads or highways in cities and incorporated villages may make such reasonable ordinances or regulations as to the rate of speed, mode of use of tracks, and removal of ice and snow, as the interest and convenience of the public may require. A corporation whose servants or agents willfully or negligently violate such an ordinance or regulation, as aforesaid, shall be liable to such city or village for a penalty not exceeding five hundred dollars."

### Sections 12 and 13 of this act of 1884 provided as follows:

"Sec. 12. Any street surface railway company may in any case operate any portion of its road by animal or horse power, or by any power other than locomotive steam power, which may be consented to by the local authorities and by a majority of the property owners, obtained in accordance with sections three and four of this act.

"Sec. 13. No company or corporation incorporated under, or constructing and operating a railroad under the provisions of this act, shall charge any passenger more than five cents for one continuous ride from any point on its road or on any road or line or branch operated by it or under its control to any other point thereon or on any connecting branch thereof within the limits of any incorporated city or village. This section shall not be construed to apply to any part of any road heretofore constructed, and now in operation, unless such company shall acquire the right to extend such road, or to construct branches thereof under the provisions of this act, in which event its rate of fare shall not exceed its authorized rates prior to such extension."

## Section 18 further provided:

"All acts and parts of acts, whether general or special, inconsistent with this act are hereby repealed."

## West Side Railway Company

In September, 1887, the West Side Street Railway Company was organized under the said act of 1884.

## Binghamton, Lestershire & Union Railroad Company.

In 1894 the Binghamton, Lestershire & Union Railroad Company was incorporated under and pursuant to article 4, chapter 565, Laws of New York 1890, being chapter 39 of the General Laws, and relating to "Street Surface Railroads."

Section 91 of the act of 1890 provides as follows as to consents:

"Such railroad shall not be built, extended or operated, unless the consent in writing, acknowledged as are deeds entitled to be recorded, of the owners of one-half in value of the property bounded on, and also the consent of the municipal authorities having control of that portion of a street or highway upon which it is proposed to build or operate such railroad shall have been first obtained."

## Section 98 provides as follows as to ordinances:

"And such authorities may make such reasonable regulations and ordinances as to the rate of speed, mode of use of tracks, and removal of ice and snow, as the interests or convenience of the public may require."

Section 100 of the act relates to motive power and changes thereof.

Section 101 of the act of 1890 provides as follows in relation to "rate of fare," viz.:

"No corporation constructing and operating a railroad under the provisions of this article, or of chapter 252 of the Laws of 1884, shall charge any passenger more than five cents for one continuous ride from any point on its road, or on any road, line or branch operated by it, or under its control, to any other point thereof, or any connecting branch thereof; and not more than one fare shall be charged for passage over the main line of road and any branch or extension thereof, whereof the right to construct such branch or extension has been acquired under the provisions of such chapter or of this article; but this section shall not apply to any part of any road constructed prior to the sixth day of May, 1884, and then in operation, unless the corporation owning the same shall have acquired the right to extend such road, or to construct branches thereof under such chapter, or shall acquire such right under the provisions of this article, in which event its rate of fare shall not exceed its authorized rate prior to such extension. The Legislature expressly reserves the right to regulate and reduce the rate of fare on any railroad constructed and operated wholly or in part under such chapter or under the provisions of this article."

These are the eight street railway companies which by consolidation and merger became the Binghamton Railway Company December 6, 1901; the final consolidation having been made under the provisions of the General Railroad Law then in force. The several mergers and consolidations were as follows:

### Consolidations.

I. October 4, 1887, pursuant to chapter 108, Laws of New York 1875, the Washington Street & State Asylum Railroad Company consolidated with the Park Avenue Railroad Company and became the "Washington Street, Asylum & Park Railroad Company."

II. March 24, 1890, under and pursuant to the same statute, said Washington Street, Asylum & Park Railroad Company (resulting from the first consolidation) consolidated with the Binghamton Central Railroad Company and the City Railway Company, and these three companies became the "Binghamton Street Railroad Company."

III. August 22, 1892, under and pursuant to the railroad law of 1890, the said Binghamton & Port Dickinson Railroad Company and the said Binghamton Street Railroad Company consolidated and became the "Binghamton Railroad Company."

### Merger.

March 31, 1894, the Court Street & East End Railroad Company and the West Side Street Railway Company were merged with or into and became the property of the said "Binghamton Railroad Company."

IV. December 6, 1901, under and pursuant to the provisions of the General Railroad Law of New York, the said Binghamton Railroad Company consolidated with the said Binghamton, Lestershire & Union Railroad Company and they became the "Binghamton Railway Company," this defendant.

### Consents and Conditions.

Each of these original companies, on its incorporation, applied to the local authorities for permission to lay its tracks in and upon the streets and highways, and also for permission to extend their tracks upon streets and highways not covered by the original certificates of incorporation, certificates of extension being subsequently filed, and such consents were given, some with and some without restrictions or conditions.

### Binghamton & Port Dickinson Railroad Company.

The consents given this company, both by the city and the towns, contained no restrictions.

### Companies Organized under Act of 1850.

January 2, 1872, the city of Binghamton gave its consent to the Washington Street & State Asylum Railroad Company to use the streets named in its charter. May 12, 1873, the city gave its consent that said company extend its tracks across the bridge.

January 12, 1887, the city gave its consent to the said Washington

Street & State Asylum Railroad Company and to the Park Avenue Railroad Company to change their motive power from horses and mules to electrical power. Prior to this time all the roads had been operated by horses and mules as their motive power. The said Park Avenue Railroad Company was constructed wholly in the town of Binghamton, outside the city of Binghamton, and was not brought under its jurisdiction until the extension of the city limits in 1875.

May 7, 1883, the city gave its consent to the Binghamton Central Railroad Company to construct its road on the streets named, and July 1, 1885, it gave to this road the right to extend its tracks across the Rockbottom bridge and on Conklin avenue, and January 28, 1890, gave this road the right to extend its tracks on Henry and Eldridge streets. These permissions for extension of July 1, 1885, and January 28, 1890, were given after the general street railroad law of May 6, 1884, had become a law.

March 17, 1884, the said city gave to the City Railway Company the right to use certain streets named in its charter, and September 19, 1890, gave this company the right to extend its tracks on Clinton street. Consents were duly given this company to lay its tracks on the highways of the town of Binghamton outside the city. The extensions of the lines of these four roads, incorporated under the act of 1850, except that of Washington Street & State Asylum Railroad Company, which extension was authorized by the special act of 1873 (Laws 1873, c. 55), were made after the act of May 6, 1884, became a law.

## Companies Organized under General Act of May 6, 1884.

May 10, 1887, the city gave its consent to the Court Street & East End Railroad Company to lay its tracks on Court and other streets. This company constructed its road on Court street and operated it for a time, but the Binghamton & Port Dickinson Railroad Company had the right under its charter (chapter 501, Laws of 1868) to occupy this street, and after the merger of the Court Street & East End Company with the Binghamton Railroad Company in March, 1894, its rights ceased to exist and the right to the operation of a street railroad on Court street has been in the Binghamton Railroad Company and its successors, derived from one of its consolidated companies. Kent v. Common Council of the City of Binghamton, 94 App. Div. 522, 88 N. Y. Supp. 34.

September 24, 1889, the city of Binghamton gave to the West Side Street Railway Company permission to lay its tracks on Oak, Leroy, and other streets of the city, and consent was also given by the local authorities of the town of Binghamton.

## Roads Created under General Law of 1890.

January 12, 1895, the town of Union gave the Binghamton, Lestershire & Union Railroad Company permission to construct and operate its road along and on the highway of the town. The village of Union, in the town of Union, and Johnson City, formerly Lestershire, are entirely outside the city of Binghamton and westerly thereof.

The rate of fare over this road between the village of Union and

the village of Johnson City is fixed by agreement at 10 cents for a single trip and 15 cents for a round trip, and a 5-cent fare is in force between intermediate points on this line.

All of the above consents, given to the companies incorporated under the general street railway law of May 6, 1884, and the consents given to the extensions of the tracks of the companies incorporated under the act of 1850, and given after May 6, 1884, expressly provided that they were given subject to the provisions of section 4 of the law of May 6, 1884, so far as pertinent thereto.

### Extensions after May 6, 1884.

After the enactment of the general street railroad law of 1884, the following extensions of the right to lay tracks and operate on the streets were granted by the city: May 25, 1896, to the Binghamton Railroad Company, on Front, Ferry, and Main streets; May 15, 1894, to the Binghamton Railroad Company on Fayette street and Floral avenue; December 18, 1893, to the Binghamton Railroad Company on Beethoven and Robinson streets; and August 25, 1903, to Binghamton Railway Company, this defendant, across the Tompkins street bridge and along Tompkins street.

All the consents to the extension of tracks to other streets of the city were given under the provisions of the General Railroad Law, and such consents provided, as required by that law, that the provisions of article 4 of the act of 1890, so far as pertinent should be applicable thereto.

February 21, 1893, an agreement was made between the Binghamton Railroad Company and the village of Port Dickinson, but it does not in any way relate to or concern the rate of fare.

### Motive Power.

In view of the provisions of certain of the consents given, and of a certain ordinance of the city, to all of which attention will be specifically called, the question of "motive power" used by these roads becomes important. Until equipped for the use of electrical power in moving their cars, all these companies used horses and mules for the purpose, and in some cases were expressly limited to the use of such motive power or to "animal power."

January 11 or 12, 1887, the city of Binghamton gave to the Washington Street & State Asylum Railroad Company and to the Park Avenue Railroad Company permission to operate its cars by electrical power in place of horses and mules. September 24, 1889, the same right was granted by the city to the Binghamton Central Railroad Company, and October 16, 1890, the city extended the same right to the Binghamton Street Railroad Company, and this permission covered or included the following roads, which then, by the consolidations above set forth, had become the property of said Binghamton Street Railroad Company, viz.: Washington Street & State Asylum, the Park Avenue, the Binghamton Central, and the City Railway Companies.

To the other companies this right to change motive power from horses and mules to electricity was given as follows: March 28, 1892,

to the Binghamton & Port Dickinson Railroad Company; March 7, 1893, to the Court Street & East End Railroad Company and to the West Side Street Railway Company. All of the resolutions of the common council of the city giving the right of extension of lines, enacted after 1893, gave the right to use electricity as motive power in operating cars.

The consents to this change of motive power imposed no condition of any kind as to the rate of fare to be thereafter charged.

### Reconstruction.

The change of power from horses and mules, or "animal power," to electrical power, involved and made necessary, substantially, a reconstruction of the several lines of road, great outlays of money, changes of cars and equipment and tracks, and the construction and installation of electrical power plants. Eventually there was a rebuilding and reconstruction of all except the roadbeds themselves, and these in many cases had to be improved or rebuilt.

### Ordinance of January 2, 1872.

Soon after the incorporation, in October, 1871, of the Washington Street & State Asylum Railroad Company (the only other company then in existence in the city of Binghamton having been created by a special act of Legislature), the company applied for permission to construct and operate its road on and over the streets of the city named in the articles of incorporation. The common council of the city of Binghamton on the 2d day of January, 1872, thereupon adopted and enacted what it denominated "An ordinance in relation to street railroads," and enacted therein (I give only the pertinent provisions):

"The common council of the city of Binghamton do ordain as follows:

"The common council of the city of Binghamton will permit to be constructed in said city, by the Washington Street & State Asylum Railroad Company, a corporation organized under and by authority of the general railroad law, passed April 2, 1850, and the several acts amending the same, a railroad which shall commence at the south end of Washington street, near the covered bridge, and to run through and over Washington street, Lewis street, Prospect avenue, Eldredge street, Cemetery street and Robinson street, to the city limits, joining the town of Binghamton on the east, to be constructed, established, maintained and operated upon the terms, conditions and stipulations hereinafter prescribed."

Provision is then made for the construction and character of the road and care of and keeping open of the streets.

"Sec. 4. The cars to be used on the said road shall be drawn by horses or mules, only at a speed not exceeding the rate of seven miles an hour.

"Sec. 5. The company may charge and collect from any person on entering their cars or carriages, for riding any distance upon said road on the same continuous route, within the corporation limits, a sum not exceeding five cents; except that children under twelve years of age in going to and from school, shall not be charged by said company a sum exceeding four cents; and also except children under five years of age, accompanied by parents or other persons having them in charge, such children to ride free. * * *

"Sec. 23. The restrictions, requirements and regulations herein imposed upon said railroad company as the condition of this grant, shall be imposed, and required of all railroad companies using horse or mule power, which may

hereafter build, establish or maintain railroads in other of the streets in said city, and for such purpose this resolution is declared to be 'an ordinance in relation to street railroads.'"

This ordinance, after granting the right to construct and operate the road on the streets mentioned, expressly provides, in section 4, that:

"The cars to be used on said road *shall be drawn by horses or mules,* only at a speed not exceeding the rate of seven miles an hour."

This section limits the motive power to "horses or mules," and necessarily excludes the use of electrical power.

Section 5 relates to the rate of fare to be charged and, as matter of course, provides a rate of fare to be charged for a ride, as specified, upon cars drawn or moved on that road by either horses or mules, and no others. If the acceptance of the grant made this a contract between the ctiy and the railroad company, as it did, the contract was that the railroad must draw or propel its cars by horse or mule power, and that for a ride on any part of such line within the boundaries of the city on cars so moved by such power it could charge 5 cents and no more. The railroad company was also restricted in other respects not necessary to be noted. The language is plain and unequivocal, and the rights granted and restrictions imposed are definite and certain. Nothing is left to implication.

Section 23 expressly provides that the "restrictions, requirements and regulations *herein* imposed" (meaning those specified in the ordinance read as a whole, and which include rates of fare) as the condition of the grant of the right to construct and operate that road—

"shall be imposed [upon] and required of *all* railroad companies *using horse or mule power,* which may *hereafter* build, establish *or maintain* railroads in other of the streets of said city, and for such purpose this resolution is declared to be 'an ordinance in relation to street railroads.'"

That is, the entire resolution as one whole is an ordinance in relation to street railroads, and one applicable *to all such roads* which are within its description of roads, viz. *those roads operated by horses or mules as the motive power and to none other.* The Washington Street & State Asylum Railroad Company was within the description, for it was expressly limited and restricted to the use of horse or mule power in operating its cars on its road, and, in defining *other roads* to come within the provisions of the ordinance, they were specified to be and limited to "all railroad companies *using horse or mule power*" which might thereafter build, establish, *or* maintain railroads on other of the streets of said city. This included all such roads, except the one then in existence and operation, which had a special charter, and with which the common council could not interfere, except in so far as the special act might permit or authorize. This placed all roads thereafter authorized on a par with the Washington Street road, unless by subsequent action some departure was made.

I think it very plain that this ordinance of the city showed its policy and purpose in regard to street railroads within the city then and thereby authorized, or that might thereafter be authorized, viz. to

provide for the use of horse or mule power in moving cars thereon and exclude the use thereon of all other motive power; and, secondly, to prescribe and limit in amount the rate of fare that might be charged to the users of *such cars* when and while so drawn and propelled. The common council did not undertake to deal with the subject of fares on the Washington Street line, or any other line, when it or they should cease to be operated by horses or mules, and come, by consent of the city, to be operated by some other motive power. There is nothing to indicate either party had other than horses and mules in mind or contemplation as a motive power. Nor did the common council undertake to deal with rates of fare on street railroads thereafter authorized, except in a general way and by carrying the rate of fare mentioned along with and as a part of the provisions as to the motive power to be used. The one restriction is dependent on the other.

It seems clear that the ordinance of 1872 was intended to impose a double restriction on the Washington Street line of road then and thereby authorized, and also on all street car lines thereafter authorized and constructed, viz. confine them to the use of horses or mules in moving cars and the payment of a 5-cent fare only (except in case of children) for a continuous ride on any part of the line when and while the cars were moved by that power; that the one condition or restriction went with the other, and was associated with and dependent on it; that when, with the consent of the city, the restriction as to motive power fell, or was done away with, and another substituted, and nothing was said as to rate of fare after such change, the restriction as to rate of fare fell, or was done away with, with it. It was not the policy or purpose of this ordinance to fix rates of fare on street railroads using other than horses or mules as a motive power, and it did not undertake to do so, and hence, when the city authorized the change of motive power from horses and mules to electricity, and imposed no restriction or limitation as to fares to be charged, as it might have done, it left these roads under the provisions of the general railroad acts applicable.

The effect of consent by a city to change from horse power to electricity is considered in the following case: Minneapolis v. Street Railway Co., 215 U. S. 417, 431, 30 Sup. Ct. 118, 54 L. Ed. 259. In that case the city claimed that the railway company, by accepting a subsequent ordinance authorizing it to change its power from horse power to electric power, lost such rights as it had under the former ordinance; that, by accepting the later ordinance, it abandoned its rights under the first. The court said:

"It is contended that the original ordinance was limited to the right to operate street railways by horse or pneumatic power, and that when the ordinance of September 20, 1890, was passed conditions were entirely changed, and a new and different mode of operation was substituted, and rights existing under the original ordinance were terminated and abandoned."

The court then went on to point out that by the language of the ordinance it appeared that the parties had other power than horse power in mind when it originally accepted the grant, and that there was no express limitation to horse power in the first ordinance, and therefore,

as the railroad company under the first ordinance had the right to charge a 5-cent fare, it was not lost by the mere change of power authorized by the second ordinance and operation under it, and that this change did not authorize the city to reduce the fare.

In the instant case the ordinance of the city of Binghamton expressly limited the power to horse and mule power, and there is not a word to indicate any other power was in the minds of the parties. The subsequent ordinance authorizing a change to electrical power, and the use of such electrical power under changed conditions of cost of maintenance, etc., is silent on the subject of fares, and the question is: Did the limitation and restriction on fare named in the original ordinance remain in force under these new conditions and this change of power, and in view of the evident policy and purpose of the city to have the restriction apply only to roads using horse and mule power?

It seems to me clear that the ordinance imposed these restrictions on the street railroads then authorized and those thereafter authorized which used horse and mule power, *and no others,* and that when the Washington Street line was subsequently authorized to use electrical power it came under the general policy, and was not thereafter subject to any legislative or contract restriction, either as to speed or rate of fare. Clearly it was no longer controlled by section 23 of the ordinance of 1872. In short, I am of opinion that under the ordinance of January 2, 1872, the Washington Street & State Asylum Railroad Company was restricted to the use of horse and mule power in moving its cars and to a speed not exceeding the rate of seven miles per hour and to a 5-cent rate of fare; that this was declared to be applicable to all roads thereafter built and using *that power,* and showed the policy and purpose as to all *such roads;* that such restrictions *were not intended to apply,* and did not apply, to roads using electrical power, and never did. I conclude that, when the Washington Street line was *thereafter authorized to use electricity,* it came under the general policy and passed from under the restrictions as to speed and rates of fare. When the main and controlling restriction was eliminated, all those dependent thereon were nullified, except as otherwise provided. The language of section 23 of the ordinance is:

"Restrictions, requirements and regulations herein imposed upon said railroad company * * * shall be imposed and required."

The 5-cent rate of section 5 is a "restriction" on the charges to be made, surely, and the mandatory clause of section 4, "The cars to be used on the said road shall be drawn by horses or mules," is a "requirement," without doubt. It cannot reasonably be contended that section 23 of the ordinance did not apply to the Washington Street line. It was the Washington Street line that the ordinance was dealing with primarily. Everything in the ordinance down to section 23 applied thereto directly and in terms. Section 23 is a plain and unequivocal enactment that all the provisions of the preceding 22 sections shall apply to all other street car lines in the city thereafter established using horse or mule power. All are put on an exact equality. It is the same as if the common council had enacted an ordinance con-

taining all the sections, preceded by the statement, "The common council of the city of Binghamton do ordain and establish the following ordinance in relation to street railways in said city, to be constructed hereafter," using the plural, "such railroads," instead of the singular, "such railroad," in the various sections, and had then added:

"Permission is hereby granted to the Washington Street & State Asylum Railroad Company to construct and operate its lines of proposed road subject to, under and pursuant to the provisions of the above ordinance."

The Binghamton Central Railroad Company was incorporated March 7, 1883, and into the consent to use the streets of the city was placed some of the provisions of the above-mentioned ordinance of January 2, 1872; but the three provisions as to horse or mule power, speed, and rate of fare were brought together, so as to read:

"That the cars to be used by said railroad shall be drawn by horses or mules only at a speed not exceeding the rate of seven miles per hour; and the said company are hereby authorized and empowered to charge for and receive from each passenger carried on their road for any distance within the city of Binghamton a sum not to exceed five cents and the company may run cars without any other conductor but a driver."

This was the first company to which permission to use streets was given after the adoption of the ordinance of 1872. That ordinance had not been repealed, and the common council was but acting pursuant to its provisions. It was mere surplusage to incorporate its provisions into the consent.

July 1, 1885, permission was given the Binghamton Central Railroad Company to extend its tracks across Rockbottom bridge and on Conklin avenue, as we have seen, and September 24, 1889, to extend its tracks on Henry and Eldredge streets, and no conditions whatever were expressly imposed. The cars on these extensions were drawn by horses or mules, or by both. Later consent was given for the substitution of electrical power on the whole line, and the substitution was made. By law these extensions were made under the provisions of the act of May 6, 1884.

March 17, 1884, the city granted to the City Railway Company the right to construct tracks from Spring Forest Cemetery to Eldredge street, "subject to an ordinance in relation to street railroads passed January 2, 1872," the one hereinbefore recited in part. The resolution of August 27, 1889, which gave the consent of the city to the City Railway Company to extend its tracks on Clinton and other streets makes no reference to the ordinance of 1872, and the resolution of September 19, 1890, gave the consent of the city that this last-named company might lay its tracks on the "streets covered by its charter with T-rails," and declared:

"Nothing therein contained shall relieve the company from any of the requirements of chapter 38 of the City Ordinances, or of any ordinance of the city."

Chapter 38 is the ordinance of January 2, 1872. This company also used horses and mules as motive power for a time.

The Binghamton & Port Dickinson Railroad Company, the Park Avenue Railroad Company, which was brought into the city of Bing-

hamton in 1875, the Court Street & East End Railroad Company, and the West Side Railway Company, from the time of their construction until by consent of the city electricity as a motive power was authorized, used horses and mules as their motive power. The ordinance of 1872 was never applicable to the Binghamton & Port Dickinson Railroad Company, as it acquired its right to use the streets and highways from its act of incorporation, and the consent of the city and town was made mandatory. The consents were given months before the ordinance of 1872 was enacted. The line of the Park Avenue Company was constructed in the town of Binghamton, and brought within the city limits, in 1875, by the extension of such limits, and that company never gave any consent to be bound by the ordinance of 1872, and it is very doubtful whether that ordinance ever became binding on it. However, if it did, it was only applicable so long as it used horses or mules as a motive power. The Court Street & East End Railroad Company was incorporated under the general street railroad law of May 6, 1884 (chapter 252, Laws of 1884). The consent of the city, given May 10, 1887, provided:

"But this consent is understood to be given subject to the conditions heretofore imposed and agreed to by the company, and upon the express condition that the provisions of the law under which the company is incorporated which are pertinent to said consent shall be complied with."

This company also used horse and mule power.

The West Side Railroad Company was given consent to use the streets of the city September 24, 1889, on the following conditions: (1) That the cars to be used might be drawn by horses or mules *or propelled by electricity.* (2) That the provisions of the act of the Legislature of May 6, 1884, and of the amendments thereto which may be pertinent thereto, shall in good faith be complied with; *also the reasonable ordinances and requirements of the city of Binghamton.*

This company was incorporated under the act of May 6, 1884, and it was made mandatory on the city to give its consent, subject to the provisions of that law. Its cars were drawn by horses or mules for about three years. I do not think it ever came under the ordinance of 1872; but, if it did, it was subject thereto so long as it used horse or mule power, and no longer. Section 13 of that act fixes the rate of fare as we have seen, and it is a general law. No act of the local authorities could modify or change that law, or take that road, or any road incorporated pursuant thereto, from under its provisions.

In People ex rel. South Shore T. Co. v. Willcox, 196 N. Y. 212, 89 N. E. 459, it was held:

"So far as the consent of the municipal authorities to the construction of the proposed line may be limited by conditions which are in conflict with the provisions of the Public Service Commissions Law, it is enough to say that the statute must prevail and such conditions are simply nugatory."

This is true as to conditions imposed which are inconsistent with the provisions of any applicable statute of the state, and it is held again and again that fixing rates of fare by law is essentially a legislative function or power.

## Contracts.

[8-13] Contracts, to be valid and binding, when not implied by law from the existence of certain conditions, result from the mutual agreement of the parties to be bound thereby, and the terms must be agreed upon, not only as to the subject-matter, but as to the things to be done by each party. The minds of the parties must meet. There can be no valid and binding agreement to violate a law, but private legal obligations imposed by statute may be varied by an agreement which is not forbidden by law, or which is not in violation of or contrary to the public policy and spirit of the law. All the terms and conditions of the contract, assuming its validity, are to be taken and read together, and each provision is to be read and construed with reference to all the other provisions having any relation to it. The parties, by mutual consent, properly evidenced, may take out of a contract one provision and substitute another, or take out one or more provisions and leave the changed contract in force, provided such removal does not destroy the entire contract; but as a general rule it is never implied that the one party assents to a change which materially affects his rights, or remedies, or both, and creates new obligations, and substitutes nothing.

Here the contract, if it was such, fixed and limited the power to be used to horses or mules, and fixed and limited the fare to be charged on street car lines of that character, and on which cars so drawn by horses or mules were used. Both provisions, as well as that relating to speed, have reference to such roads and to no others, and both such provisions were of the very essence of the contract. The change in the one respect, that of power, was so fundamental, important, and far-reaching that it cannot be implied or surmised that the change of power was a mere substitution in the contract of one thing for another, leaving the contract as thus changed in full force and effect.

In 13 Corpus Juris, 588, it is said:

"As a contract is the result of agreement, so an agreement may put an end to a contract. Therefore a contract may be discharged at any time before the performance is due by a new agreement with the effect of altering the terms of the original agreement or of rescinding it altogether; and a claim under the original contract may then be met by the new agreement so far as the latter operates to alter or to rescind the former. The discharge may take the form either of a total obliteration of all contractual relations between the parties in regard to the subject-matter of the contract, or it may be effected by the substitution of a new agreement in place of the old one."

In American Fine Art Co. v. Simon, 140 Fed. 529, 536, 72 C. C. A. 45, 52, the Circuit Court of Appeals, Second Circuit, said:

"It is well settled that a contract not performed on either side may be discharged by agreement of the parties, and that *this discharge may be effected by a change in the terms* whereby a new contract is in effect substituted for the old one."

It is a question of what the parties intended, whether to merely make a change in one respect, leaving the contract in full force and effect otherwise, to make a new contract entirely, or to wholly discharge the old one; and in this case it cannot reasonably be supposed or held that

the railroad company, when the motive power was changed from horses and mules to electricity, thereby imposing great expense and new obligations, intended to remain bound by the provisions as to rate of fare contained in the ordinance of 1872, which might not be at all adequate or appropriate to changed conditions. New statutes applicable to such a situation had been enacted and were in force. Section 13 of the act of 1884 limited the rate of fare to be charged to 5 cents—

"for one continuous ride from any point on its road, or on any road or line or branch operated by it or under its control, to any other point thereon or on any connecting branch thereof within the limits of any incorporated city or village."

This was made more effective for the protection of the city and its people and the general public, and more beneficial to them, and it cannot be assumed it was contemplated, when changing from horse and mule power to electrical power, that it was intended or considered necessary to violate the spirit of the statute of 1884, by making a contract as to fares in disregard of its provisions. By coming under the provisions of that law as to fares, the only benefit the railroad company would derive was the right to avail itself of any statute then or thereafter enacted and in force allowing the Legislature to fix the rate of fare itself or by a public service or other commission. It must be borne in mind that all of the consents to a change of motive power from horses and mules to electrical power were given after the enactment of chapter 252 of the Laws of 1884, an act entitled "An act to provide for the construction, extension, maintenance and operation of street surface railroads and branches thereof in cities, towns, and villages," and was broad and general in its provisions, and intended to be, and that its provisions applied in terms not only to companies organized under the act, but to "any existing street surface railroad company or corporation heretofore organized for the purpose of building and operating a street railroad" (see section 3, quoted above), and that it fixed rates of fare for all of such roads (see section 13), and also provided what ordinances affecting all such roads could be enacted by such cities, towns, and villages. No street surface railroad company or corporation was excepted from its provisions, and the purpose to bring them all under its provisions could not have been made plainer. It is, of course, true that the act did not purport or attempt to cancel or interfere with constitutionally protected existing valid contracts, for that it could not do. City of Minneapolis v. M. Street R. Co., 215 U. S. 417, 427, 30 Sup. Ct. 118, 54 L. Ed. 259. But the cities, towns, and villages acting under its provisions thereafter, and granting rights, privileges, and extensions, are presumed to have had knowledge of all the provisions of the act, and to have acted with reference thereto.

In Anson on Contracts, c. 2, pt. 5, p. 337, the different ways by which a party may be discharged from the obligations of a contract are stated:

"(1) By the performance of all the duties undertaken by either party and the satisfaction of the rights secured thereby. (2) It may be discharged by the operation of rules of law upon certain sets of circumstances."

Under the head of "Waiver" the author says (chapter 1, pt. 5, p. 338):

"A contract may be discharged by express agreement that it shall no longer bind either party. This process is called a waiver, cancellation, or rescission of the contract. An agreement of this nature is subject to the rule which governs all simple contracts, with regard to consideration. And the consideration for the promise of each party is the abandonment by the other of his rights under the contract. The rule, often stated, that 'a simple contract may, before breach, be waived or discharged, without a deed and without consideration,' must be taken to mean that, where the contract is executory, no further consideration is needed for an agreement to rescind than the discharge of each party by the other from his liabilities under the contract."

The restriction to a fare of 5 cents was inseparably connected with the use of horse or mule power. Then why did not the change to electricity, the abandonment of horses and mules as a motive power, and the acceptance of the improved method and consent thereto, operate as a waiver of the restriction as to fare so inseparably connected therewith?

The author further says (page 342):

"And it operates as a rescission in this way: That if it does not in terms express an intention that the original contract should be waived, it indicates such an intention by the introduction of new terms or new parties. The change of rights and liabilities, and consequent extinction of those which before existed, forms the consideration on each side for the new contract."

And at page 346 we find the following:

"A contract may contain within itself the elements of its own discharge, in the form of express provisions for its determination under certain circumstances. These circumstances may be the nonfulfillment of a specified term of the contract, the *occurrence of a particular event*, or the exercise by one of the parties of an option to determine the contract."

And the following:

"The parties may introduce into the terms of their contract a provision that the fulfillment of a condition or the occurrence of an event shall discharge them both from further liabilities under the contract. Such a provision is called a condition subsequent, and is well illustrated by the case of a bond, which is a promise subject to, or defeasible upon, a condition expressed in the bond."

Can it be doubted that making the rate of fare mentioned in the ordinance of 1872, and the restrictions and conditions therein contained, applicable to roads operated by horse and mule power exclusively, and to those only, operated as matter of law to render ineffective and inoperative such provision as to rate of fare, when the use of horses and mules was abandoned with the consent of the city and the new and improved and expensive electrical system was installed?

In Omaha Horse Ry. Co. v. Cable Tramway Co. (C. C.) 30 Fed. 324, the plaintiff company, by its charter, was given the exclusive "horse railroad" franchise of the city of Omaha for 50 years. It constructed its road. Cable roads were not then known, at least were not in use. Later a city ordinance granted the right to the defendant company to construct and operate a cable road on the same streets, or some of them, and it undertook to do so, and plaintiff sought to enjoin it,

claiming that this was an infringement of its grant. It was held, Judge Brewer, later of the Supreme Court of the United States, giving the opinion, that it was not an interference, and also:

"That even if the grant of the 'horse railroad' franchise meant a grant of the 'street railroad' franchise in the contemplation of the parties, yet a grant of a monopoly contemplated was only of such forms of transportation as were then known and in existence, not of such as might subsequently be devised and used."

In Saginaw Gaslight Co. v. City of Saginaw (C. C.) 28 Fed. 529, it was held that the grant of the exclusive right to light the city with gas for 30 years was not impaired by the subsequent grant to another company of the right to light the city with electricity.

These cases illustrate and emphasize the wide and fundamental distinction between the grant of a power to use horses and mules in drawing street cars, and the subsequent grant of the power to use electrical power on the same roads. The changes authorized and made struck to the very roots of the ordinance and alleged contract, and in effect provided for the entire reconstruction of the roads with new and different equipment and modes of operation. Many of the provisions of the ordinance of 1872, applicable to the movement and operation of the old horse cars drawn by horses or mules became wholly inappropriate, and inapplicable or inefficient, when applied to the operation of roads and cars operated and propelled by electricity. Not unlike a revolution in a government, actually accomplished by force or otherwise, when the new system and laws adopted by the new government are put in operation, especially with the consent of the old, it requires the enactment of no repealing statutes, and it is not essential that the new system differ in each and every respect in order to do away entirely with the old one.

[14, 15] It has been argued and contended that, even if the ordinance of January 2, 1872, and the construction and operation of these roads thereafter, did not constitute a binding contract, or if the authorized change of power from horses and mules to electricity abrogated such contracts, assuming their existence up to that time, that a contract as to rates of fare exists between said railroad companies and the city of Binghamton because of the insertion in the consents granted after the act of May 6, 1884, became operative, of the requirement imposed by section 4 of chapter 252 of said Laws, and the subsequent acts on the same subject, making it mandatory upon municipal authorities, in granting such consents to the construction and operation of street surface roads, to provide therein that:

"The consent of the local authorities shall in all cases be applied for in writing, and when granted shall be upon the express condition that the provisions of this act pertinent thereto shall be complied with, and shall be filed," etc.

It is evident that the Legislature inserted this provision in the law of 1884, to make certain that the cities and villages of the state did not grant consents to the use of their streets by street railroad corporations, except on compliance with all the conditions pertinent *to the grant of such consents.* This provision has nothing to do with rates

of fare, and is not an exaction that contracts in relation to rates of fare or the financial management of the road shall be entered into and incorporated in the consents. It is a restriction on the city and village authorities in granting consents. The act itself in section 13 fixes the rate of fare absolutely. It required no contract, no agreement, no limitation in the consents granted fixing the rates of fare, or consenting to the rate established by law. Section 13 applied, not only to roads thereafter constructed, but to all extensions of existing roads and necessarily to roads obtaining extensions. Nothing in the act of 1884 permitted or sanctioned the making of any contract as to the rate of fare. The fixing of rates of fare on such roads is a legislative function exercised in the interest of the public, and when such function was exercised by the Legislature any contract in relation thereto fixing a rate would have been unlawful and void. The making of such contracts would be contrary to the public policy of the state and evidenced by the general act of 1884, and subsequent acts whereby the Legislature of the state proceeded to assert and exercise its power in this regard. See Gulf, C., etc., Ry. Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Texas & Pac. R. Co. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681; New Haven R. R. Co. v. Interstate Com. Com'n, 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515; 1 Page on Contracts, p. 177. It is a general principle that when the state, or the nation, has power to regulate and control a matter by law, until it does act parties are at liberty to contract with reference thereto, but when it does act and covers the subject the statute absolutely and exclusively controls.

### State has Assumed to Control Rate of Fare.

[16] In and by the act of May 6, 1884, and from that time to the present, the state of New York has exercised its power to fix rates of fare on street railroads. See Railroad Law of 1890; section 1, c. 688, Laws of 1897. Chapter 688 of Laws of 1897, amended section 101 of chapter 565 of the Laws of 1890 (as amended by chapter 676 of the Laws of 1892), by adding thereto the following:

"The Legislature expressly reserves the right to regulate and reduce the rate of fare on any railroad constructed and operated wholly or in part under such chapter or under the provisions of this article."

The present law, derived from the law of 1890, section 101, as amended in 1897, reads as follows:

"No corporation constructing and operating a railroad under the provisions of this article, or of chapter 252 of the Laws of 1884, shall charge any passenger more than five cents for one continuous ride from any point on its road, or on any road, line or branch operated by it, or under its control, to any other point thereof, or any connecting branch thereof, within the limits of any incorporated city or village. Not more than one fare shall be charged within the limits of any such city or village, for passage over the main line of road and any branch or extension thereof if the right to construct such branch or extension shall have been acquired under the provisions of such chapter or of this article; except that in any city of the third class, or incorporated village, it shall be lawful for such corporation to charge and collect as a maximum rate of fare for each passenger, ten cents, where such passenger is car-

ried in a car which overcomes an elevation of at least four hundred and fifty feet within a distance of one and a half miles. This section shall not apply to any part of any road constructed prior to May 6, 1884, and then in operation, unless the corporation owning the same shall have acquired the right to extend such road, or to construct branches thereof under such chapter, * * * in which event its rate of fare shall not exceed its authorized rate prior to such extension. The Legislature expressly reserves the right to regulate and reduce the rate of fare on any railroad constructed and operated wholly or in part under such chapter or under the provisions of this article; and the public service commission shall possess the same power, to be exercised as prescribed in the public service commissions law." Consol. Laws, c. 49, § 181.

This provides, as did the act of 1890, that:

"This section shall not apply to any part of any road constructed prior to May 6, 1884, and then in operation, *unless the corporation owning same shall have acquired the right to extend such road,* or to construct branches thereof under such chapter," etc.

And then follows the reservation.

August 25, 1903, the city of Binghamton by resolution duly and explicitly authorized the Binghamton Railway Company, the defendant, which *then* owned and operated *all of the roads,* to extend *its road* across the Tompkins Street bridge and along Tompkins street upon and subject to certain conditions, viz. a contract of April 26, 1892, relating to the amount the railroad company was to pay towards pavements, also certain provisions of article 4 of the act of June 7, 1890, known as the Railroad Law.

By the consolidations and mergers as shown the road ·of the defendant had become one road, and in applying for and obtaining benefits and privileges it was acting as a corporation, and the city in granting such extensions, etc., was granting it to the Binghamton Railway Company, and the resolution so expressly states, viz.:

"Whereas, the Binghamton Railway Company did on the 25th day of July, 1903, apply * * * for consent to extend, construct, operate and maintain: * * * Resolved, in consideration, * * * the consent of the common council of the city of Binghamton, N. Y., is hereby given, pursuant to law, to the Binghamton Railway Company to extend, construct, operate and maintain," etc., such extensions.

While it may be that each of the corporations existed and had not been wound up or dissolved, all the property and property rights, etc., had become the property of the Binghamton Railway Company, the present defendant, and it was acting in the premises, and the city was dealing with it, and not with some part of it, or some one of the old corporations. I think it very clear that the city, by its common council, not only recognized the right of the Legislature to fix fares for a ride on all the various lines thereafter, but by its action assented thereto. When such extension was granted, the entire line within the city by its consent came under the general Railroad Law.

It will be noticed that article 5 of chapter 481 of the Laws of 1910, chapter 49 of Consolidated Laws, known as the Railroad Law (section 170), and now in force, provides:

"The provisions of this article shall apply to every corporation which, under the provisions thereof, or of any other law, has constructed or shall construct or operate, or has been or shall be organized to construct or operate, a street

surface railroad, or any extension or extensions, branch or branches thereof, for public use in the conveyance of persons and property for compensation, upon and along any street, avenue, road, highway, or private property, in any city, town or village, or in any two or more civil divisions of the state, and every such corporation must comply with the provisions of this article."

It also has the same provisions as before quoted, giving power to pass ordinances, and excludes the enactment of an ordinance as to rates of fare.

In Milwaukee Electric Railway & L. Co. v. Railroad Commission of Wisconsin, 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254, the court held not only that "the fixing of rates which may be charged by public service corporations [in this case a street car corporation] is a legislative function of the state," but that the grant or surrender of that power to the municipality cannot lightly be assumed or presumed. If such grant or surrender is made, *it must be made in plain and unequivocal terms.* The court quotes with approval the language of Mr. Justice Moody in Home Tel. Co. v. Los Angeles, 211 U. S. 265, 273, 29 Sup. Ct. 50, 52 (53 L. Ed. 176), viz.:

"The surrender, by contract, of a power of government, though in certain well-defined cases it may be made by legislative authority, is a very grave act, and the surrender itself, as well as the authority to make it, must be closely scrutinized. No other body than the supreme legislature (in this case, the Legislature of the state) has the authority to make such a surrender, unless the authority is clearly delegated to it by the supreme legislature. The general powers of a municipality or of any other political subdivision of the state are not sufficient. *Specific authority for that purpose is required.*"

The Railroad Act of 1850, in section 28, subd. 9, conferred on the railroad company power "to *regulate* the time and manner in which passengers and property shall be transported, and the compensation to be paid therefor; but such compensation, for any passenger and his ordinary baggage, shall not exceed three cents per mile." But in section 33 of the same act the power to "*alter* or reduce the rate of freight, *fare,* or other profits," etc., *was expressly reserved.* The general act of 1884 (chapter 252), as seen already, restricts ordinances to rate of speed, mode of use of tracks, and removal of ice or snow, and contains no surrender or delegation of authority to fix or regulate rates of fare.

I think it clear that all of these roads have come under and are subject to the general railroad laws, and that there is no contract in force which prevents the Public Service Commission from now establishing or authorizing the fixing of rates of fare thereon, considered as one line.

In Milwaukee, etc., v. Railroad Commissions, etc., 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254, decided in 1915, the court called special attention to the fact that in Cleveland v. Cleveland City Ry., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, the Ohio courts had specifically held that the acceptances of ordinances of the character specified constituted a binding contract, and the statute of Ohio was set forth and held to specifically authorize a binding contract for the period of time named. Section 3443 of the Ohio statute provided:

"*Council, etc., may Fix Terms and Conditions.*—Council or the commission-ers, as the case may be, shall have the power to fix the terms and conditions upon which such [street] railways may be constructed, operated, extended, and consolidated."

Here was found the express legislative grant of the necessary power to contract.

In Minneapolis v. Minneapolis Street Ry., 215 U. S. 417, 30 Sup. Ct. 118, 54 L. Ed. 259, the ordinance which was held to constitute a binding contract as to rates of fare was specifically validated by a sub-sequent act of the Legislature.

In Milwaukee Ry. v. Wisconsin R. R. Comm., supra, the court quotes and approves the language of the Chief Justice in Manitowoc v. Manitowoc & N. T. Co., 145 Wis. 13, 129 N. W. 925, 140 Am. St. Rep. 1056, viz.:

"No specific authority having been conferred on the city to enter into the contract in question, the right of the state to interfere whenever the public weal demanded was not abrogated. The contract remained valid between the parties to it until such time as the state saw fit to exercise its paramount au-thority, and no longer. To this extent, and to this extent only, is the con-tract before us a valid subsisting obligation."

I cannot assent to the proposition, in view of the decisions, that where such ordinances as we find in the instant case were passed and consents granted under statutes reserving the power in the Legislature to *alter* or change rates, etc., that the acceptance of the conditions im-posed by the municipality constituted a valid and binding contract *for all time, or during the life of the charter.* It seems to me the sur-render of power, if there was such surrender, was for a limited period only; that is, that the contract remained valid between the parties to it until such time as the state should see fit to exercise its para-mount authority, and no longer, and using the quotation, and applying it to this case, the contract remained valid between the parties to it until such time as the state saw fit to exercise its paramount author-ity, and no longer. The authority of the state of New York in the premises has not been surrendered, and it has not approved or vali-dated any of the alleged ordinances or contracts. The state from time to time has asserted its paramount authority by new legislation on the subject, and the municipality has recognized and acted under and availed itself of such new legislation by granting extensions of lines of roads, obtaining benefits, and otherwise, and the railroad has also recognized the validity of such laws and has availed itself of their provisions. Neither party has questioned the paramount power and authority of the state in the premises.

In Freeport Water Co. v. Freeport City, 180 U. S. 587, 600, 21 Sup. Ct. 493, 498 (45 L. Ed. 679), the question was as to the construc-tion of a statute by which the city council was authorized to contract with any person or corporation to construct and maintain waterworks "at such rates as may be fixed by ordinance, and for a period not ex-ceeding thirty years." The court held:

"The words 'fixed by ordinance' may be construed to mean by ordinance once for all to endure during the whole period of 30 years, or by ordinances

from time to time as might be deemed necessary. Of the two constructions, that must be adapted which is most favorable to the public, not that one which would so tie the hands of the council that the rates could not be adjusted as justice to *both parties might require at a particular time.*"

So the court held that the action of the council in reducing and charging the rate from that first established under and by a new ordinance enacted by it was justified. A valid contract binds both parties, if it binds either, and in that case under the holding of the court the water company itself could have applied to the Legislature for an increase of rate, and the Legislature could have granted it or authorized it.

In the instant case, under the act of 1850 (chapter 140, § 28, subd. 9, and section 33), while the city could enact an ordinance "to * * * regulate the compensation to be paid therefor" (transportation of persons), by section 33 the Legislature expressly reserved and retained the power to *"alter* or reduce the rate of freight, fare," etc. This it can do at any time. The consents were given and the road constructed subject to the act of 1850, and all its provisions must be read in connection with the ordinance. The ordinance could not, legally, be broader than the delegation or surrender of authority made by the Legislature.

[17] Matter of Quimby v. Public Service Commission for Second District, 223 N. Y. 244, 119 N. E. 433, is urged as decisive here. Notwithstanding the strong dissent in that case, it must be accepted as the law of the state of New York as to the power of the Public Service Commission in the Second District. Has the case any decisive application in the instant case?

The New York State Railways (a street surface railway), a corporation, applied to the Public Service Commission for an order authorizing it to increase its rate of fare in the city of Rochester from five to six cents. It was held that there was a valid and subsisting *contract* between the railroad and the city providing that a fare of 5 cents only could be charged, and that *the Public Service Commission had not been granted the power by the Legislature to increase the fare with such contract existing, even if the Legislature had reserved and retained to itself such power; that is, power to change or ignore the contract.* Whether such power had been retained was not decided; the court saying:

"It is, however, unnecessary, and therefore improper, to decide at this time what the limits of legislative power are in this connection. The delegation of legislative power to commissions and other administrative officers and boards need not be assumed, if the general words from which such delegation may be inferred are not reasonably so construed. In the absence of clear and definite language, conferring without ambiguity jurisdiction upon the Public Service Commission to increase rates of fare agreed upon by the street railroad and the local authorities, we should not unnecessarily hold that the Legislature has intended to delegate any of its powers in the matter, whatever its powers may be."

The court then goes on to say that three courses in fixing rates are open to the Legislature, viz.: To itself prescribe the rates; to delegate the power to the commission; to leave the matter to agreement

between the railroad company and the local authorities—and that by plain words the Legislature has conferred on the Public Service Commission power to regulate rates fixed by statute, but has used no word or words disclosing an intent in so doing to deal with the matter of rates fixed by *agreement* between the railroad company and the local authorities.

However great the doubt expressed as to whether the Legislature had reserved the power to regulate the fares, increase or diminish them, I think it settled that it is not necessary for the Legislature in fixing fares, or providing for consents to the use of streets by cities, to reserve any such power. It is reserved, or rather is not parted with. The power to regulate, etc., cannot be granted away or abrogated or abdicated by the Legislature. This is settled in Union Dry Goods Co. v. Georgia Public Service Corporation, 248 U. S. 372, 39 Sup. Ct. 117, 63 L. Ed. —, decided January 7, 1919, by the Supreme Court of the United States. In that case the Georgia Public Service Corporation contracted with the Union Dry Goods Company for the term of five years to supply it with electric light and power at fixed rates. The parties acted under and pursuant to this contract for two years, when the Railroad Commission of Georgia made the following order, viz.:

"Ordered, that on and after March 1, 1914, and until the further order of the commission, the following schedule of rates shall be the maximum schedule of rates to be charged by the Georgia Public Service Corporation"

—and then followed the rates complained of, and which the Union Dry Goods Company refused to pay, setting up its contract. The court, in affirming a judgment upholding the validity of the order, said:

"The plaintiff in error did not assert in its pleadings, or offer evidence tending to prove, that these commission rates were unreasonable, but complained *only that they were higher than the contract rates, and for this reason, it argued, that to give effect to the order, as the state Supreme Court did, violated the provisions of the Constitution referred to.*

"The presumption of law is in favor of the validity of the order, and the plaintiff in error did not deny, as it could not successfully, that capital invested in an electric light and power plant to supply electricity to the inhabitants of a city is devoted to a use in which the public has an interest which justifies rate regulation by a state in the exercise of its police power. Munn v. Illinois, 94 U. S. 113 [24 L. Ed. 77]; Budd v. New York, 143 U. S. 517 [12 Sup. Ct. 468, 36 L. Ed. 247]; German Alliance Ins. Co. v. Lewis, Superintendent of Insurance of the State of Kansas, 233 U. S. 389, 407 [34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189].

"Thus it will be seen that the case of the plaintiff in error is narrowed to the claim that reasonable rates, fixed by a state in an appropriate exercise of its police power, are invalid for the reason that, if given effect, they will supersede the rates designated in the private contract between the parties to the suit, entered into prior to the making of the order by the Railroad Commission.

"Except for the seriousness with which this claim has been asserted and is now pursued into this court, the law with respect to it would be regarded as so settled as not to merit further discussion.

"That private contract rights must yield to the public welfare, where the latter is appropriately declared and defined and the two conflict, has been often decided by this court. Thus in Manigault v. Springs, 199 U. S. 473, 480 [26 Sup. Ct. 127, 130 (50 L. Ed. 274)], it was declared that:

" 'It is the settled law of this court that the interdiction of statutes im-

pairing the obligation of contracts does not prevent the state from' properly exercising its police powers 'for the good of the public, though contracts previously entered into between individuals may thereby be affected.'

"This on authority of many cases which are cited.

"In Hudson Water Co. v. McCarter, 209 U. S. 349, 357 [28 Sup. Ct. 529, 531 (52 L. Ed. 828)], it is said that:

" 'One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them. The contract will carry with it the infirmity of the subject-matter.'

"In L. & N. R. R. Co. v. Mottley, 219 U. S. 467, 482 [31 Sup. Ct. 265, 270 (55 L. Ed. 297, 34 L. R. A. [N. S.] 671)], this is quoted with approval from Knox v. Lee, 12 Wall. 457, 550, 551 [20 L. Ed. 287], viz.:

" 'Contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to defeat the legitimate government authority.'

"In the same report, in Chicago, B. & Q. R. R. Co. v. McGuire [219 U. S.] 567 [31 Sup. Ct. 362, 55 L. Ed. 328], it is said:

" 'There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community.'

"In Atlanta Coast Line R. R. Co. v. Goldsboro, 232 U. S. 548, 558 [34 Sup. Ct. 364, 368 (58 L. Ed. 814)], the court said:

" 'It is settled that neither the "contract" clause nor the "due process" clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.'

"And in Rail & River Coal Co. v. Ohio Industrial Commission, 236 U. S. 338, 349 [35 Sup. Ct. 359, 362 (59 L. Ed. 607)], the state of the law upon the subject is thus aptly described:

" 'This court has so often affirmed the right of the state in the exercise of its police power to place reasonable restraints, like that here involved, upon the freedom of contract, that we need only to refer to some of the cases in passing.'

"These decisions, a few from many to like effect, should suffice to satisfy the most skeptical or belated investigator that the right of private contract must yield to the exigencies of the public welfare when determined in an appropriate manner by the authority of the state, and the judgment of the Supreme Court of Georgia must be affirmed."

It follows that the power of the Legislature of the state of New York in the instant case is unimpaired, and even if there were at one time contracts in existence as to rates of fare, they do not interfere with the right of the state itself to increase or diminish the rates.

[18, 19] However, this does not cover the proposition of the Quimby Case, supra, that the Legislature of the state of New York has not conferred authority on the Public Service Commission to regulate or increase rates of fare on street railroads in those cases where a valid contract is in force. Hence the necessity in this case of determining whether or not one or more valid subsisting contracts exist between the city of Binghamton and the railroad company as to rates of fare of such a nature and character as deprives the Public Service Commission of jurisdiction in this matter.

In City of Englewood v. Denver & South Platte Railway Co., 248 U. S. 294, 39 Sup. Ct. 100, 63 L. Ed. ——, decided by the Supreme

Court of the United States January 7, 1919, the city of Englewood while a town—that is, before its incorporation as a city—granted a franchise to the Denver & South Platte Railway Company to operate its railway and charge certain fares, provided it would arrange for passengers on its road to be transported without extra fare over the line of the Denver City Tramway Company from a point of connection, and in a like manner for passengers on that company's line to be carried over the line of the Denver & South Platte Railway Company without additional charge. The last-named railroad company (Denver & South Platte) operates its street railway under that franchise, which it accepted, but does not comply with the terms of the agreement; its defense being that the said tramway company charges 5 cents, the maximum fare allowed, for its part of the service, so that the South Platte Railway Company, defendant in the suit, gets nothing, and that it had filed a schedule of rates with the state Public Utilities Commission (as required by it), which had become its established rates and charges. The suit was instituted to compel the defendant to comply with its agreement under which it operated. On demurrer to the bill the Supreme Court of the state of Colorado held that:

"The town, at least, deriving its powers from legislative grant, could make no contract of this sort *that was not subject to control by the Legislature; that the* Public Utilities Commission *had been authorized by the Legislature to regulate the matter in controversy; that it had done so*, and that the proceeding (to compel the Denver & South Platte Railway Company to carry out its contract) should be dismissed."

The Supreme Court said:

"Of course we do not go behind the decision of the court that the matter in controversy was subject to regulation by the commission and was regulated by it in due form if the state could confer that power. The plaintiff says that the state could not confer it since to do so would impair the obligation of a contract. Upon that point we agree with the court below that clearer language than can be found in the state laws and this ordinance must be used before a public service is withdrawn from public control. Milwaukee Electric Ry. & Light Co. v. Railroad Commission of Wisconsin, 238 U. S. 174, 180 [35 Sup. Ct. 820, 59 L. Ed. 1254]. The cases generally are cases where the railroad or other company sets up contract rights against the city. *Whether, when the railroad consents, a Legislature would not have all the power that the city could have to modify even a constitutionally protected contract, need not be considered here.*"

Here, again, we have a case where it is conceded the Legislature of the state had conferred on the Public Utilities Commission the necessary power to act in the matter and deal therewith. But it is intimated very strongly that when, as in the instant case, a city is authorized by the Legislature to consent to the construction and operation of street car lines on its public streets, and such consents are given, and actual contractual relations are entered into, which have the protection of the constitutional provisions, the Legislature itself, *with the consent of the railroad,* may abrogate or disregard such contracts without the consent of the city. In other words, the Legislature may not bargain away its power, or abdicate in those matters relating to the police power of the state, to which the fixing of rates to be charged by a public utilities corporation belongs. These powers *are inalien-*

*able even by express grant of the Legislature.* Atlanta Coast Line R. R. Co. v. Goldsboro, 232 U. S. 548, 558, 34 Sup. Ct. 364, 58 L. Ed. 721, supra.

I am not to be understood as assenting to the holding in the Quimby Case, supra, that the Legislature of the state of New York has not and did not intend to confer on the Public Service Commission full power and authority to regulate and increase rates of fare on all railroads in the state, including all street car lines, when the facts found by such commission were such as to bring such railroad within its provisions. As I read the Quimby Case the court places its decision on the ground stated:

"But our Constitution, by requiring the consent of the local authorities, recognizes that our municipalities are pro tanto independent of legislative control, exercising some fragment of power, otherwise legislative in character, which has been thus *irrevocably transferred by the fundamental law* (meaning the Constitution) from the Legislature to the locality."

Of course, if the framers of the state Constitution of the state of New York in fact destroyed the integrity of the state as a state possessing *all* the sovereignty of an independent state as to fixing fares on street railways, and have made each city and village an independent sovereignty in such matters, then the state and its Legislature has nothing further to do with the matter, and the local authorities are *supreme* in the matter of fares on street railroads. As I read the constitutional provision, it neither grants nor surrenders to the local authorities any supreme or paramount power or sovereignty. It merely *forbids* the Legislature to enact a law authorizing the construction or operation of a street railroad, except such law provides for two things: (1) The consent of the owners of one-half in value of the property bounded on that portion of a street or highway upon which it is proposed to construct and operate such road; and (2) the consent of the local authorities having the control of the street or highway on which it is proposed to construct and operate such road. If the law contains such provisions, it is a valid law; and if it does not, it is an invalid law. This constitutional restriction on legislation has nothing to do either with rates of fare or with a surrender or abandonment of sovereignty by the state to the local authorities, and it says nothing as to the making of contracts when consents are obtained which shall be beyond the power of the Legislature.

Undoubtedly the people of a state may by its Constitution surrender power to local authorities, but the language to that end should be plain and unequivocal. See cases cited as to surrender of legislative powers. In fact, the consent of the property owners is not necessary, for the Constitution itself says, if they do not consent, the court may say, through commissioners and a confirmation of their finding, whether or not the road ought to be constructed and operated. If the local authorities do not *consent,* the road cannot be constructed and operated, if objection is made. No requirement is imposed on the local authorities. The local authorities are *granted no power whatever* by this constitutional provision. Article 3, § 18, as amended in 1875. The section is headed:

"Cases in Which Private and Local Bills shall Not be Passed; Restrictions as to Laws Authorizing Street Railroads."

By its original charter the city of Rochester is given power "to contract and be contracted with." Laws 1907, c. 755, § 2. It is a legislative grant of power pure and simple, and is subject to the control of its grantor, the Legislature. The right and power of the local authorities to consent or not consent remain unaffected. The powers of the local authorities are neither greater nor less than they were before the adoption of this section 18 of article 3 of the Constitution. And the Constitution of the state of New York says nothing about power in the local authorities to make contracts respecting fares or otherwise when granting consents. If such contracts are made, they are subject to the paramount sovereignty of the state. The Legislature is not prohibited to impair them in such cases as this. See cases cited.

I cannot conceive of a broader jurisdictional power than that conferred by the Public Service Commissions Law (subdivision 1, § 49, as amended by Laws 1911, c. 546, § 1), of New York, which, so far as pertinent, reads as follows:

"*Rates and Service to be Fixed by the Commission.*—1. Whenever either commission shall be of opinion, after a hearing had upon its own motion or upon a complaint, that the rates, fares or charges demanded, exacted, charged or collected by any common carrier, railroad corporation or street railroad corporation subject to its jurisdiction for the transportation of persons or property within the state, or that the regulations or practices of such common carrier, railroad corporation or street railroad corporation affecting such rates are unjust, unreasonable, unjustly discriminatory or unduly preferential, or in any wise in violation of any provision of law, or that the maximum rates, fares or charges, chargeable by any such common carrier, railroad or street railroad corporation are insufficient to yield reasonable compensation for the service rendered, and are unjust and unreasonable, the commission shall with due regard among other things to a reasonable average return upon the value of the property actually used in the public service and to the necessity of making reservation out of income for surplus and contingencies, determine the just and reasonable rates, fares and charges to be thereafter observed and in force as the maximum to be charged for the service to be performed, notwithstanding that a higher rate, fare or charge has been heretofore *authorized by statute*, and shall fix the same by order to be served upon all common carriers, railroad corporations or street railroad corporations by whom such rates, fares and charges are thereafter to be observed."

The opinion in the Quimby Case concedes that the New York State Railways (involved there) was within the jurisdiction of the Public Service Commission, so far as rates of fare fixed "*by statute*" were concerned, but the decision asserts that, as the rates of fare in that case were *fixed by contract* between the city of Rochester and the Railways Company, the Public Service Commission was without jurisdiction to change the rate of fare; in short, that when rates of fare are fixed by agreement between a city and the railroad company, the Public Service Commission has no jurisdiction. If there be any such limitation on jurisdiction, it must be found in the words "notwithstanding that a *higher* rate, fare, or charge has been heretofore authorized by statute," and by the words "or in any wise in violation of any provision of law." These words last quoted are clearly disjunctive, and it is not to be implied that the preceding and following words refer

to rates or fares fixed by some statute and exclude those fixed by agreement, and which agreements, if made, are and must be "authorized by statute." The last words quoted evidently refer to cases where the Legislature has fixed a rate and it is desired to *reduce* that rate, and hence the power is given to reduce a rate so fixed in explicit terms.

However, the holding in the Quimby Case is controlling as to the proper interpretation of the statute quoted, as there is no decision of the Supreme Court of the United States to the contrary. When the highest court of a state has interpreted a statute of such state, that interpretation is accepted by the Supreme Court; no infringement of the Constitution of the United States being involved, except when the Supreme Court has itself first passed thereon. This court is bound by the Quimby Case, as is the Public Service Commission of the state. Equitable Life Assurance Soc. v. Brown, 213 U. S. 25, 43–45, 29 Sup. Ct. 404, 53 L. Ed. 682; Peters v. Broward, 222 U. S. 483, 492, 32 Sup. Ct. 122, 56 L. Ed. 278; Hunter v. Pittsburgh, 207 U. S. 161, 28 Sup. Ct. 40, 52 L. Ed. 151; Ughbanks v. Armstrong, 208 U. S. 481, 28 Sup. Ct. 372, 52 L. Ed. 582; Lindsley v. Natural Carbonic Gas Co., 220 U. S. 61, 31 Sup. Ct. 337, 55 L. Ed. 369, Ann. Cas. 1912C, 160; Virginia-Carolina Co. v. Kirven, 215 U. S. 252, 30 Sup. Ct. 78, 54 L. Ed. 179; Brown Forman Co. v. Kentucky, 217 U. S. 563, 30 Sup. Ct. 578, 54 L. Ed. 883; and see 40 L. R. A. (N. S.) 380, 398, 402.

This case and the action of the Public Service Commission, in view of the Quimby Case, must rest on the proposition that no valid binding contract as to and fixing rates of fare on the line of the Binghamton Railway Company is now in force.

That no such contract is in force is the conclusion reached and stated above. If this conclusion is correct, there is no obstacle in the way of favorable action by the Public Service Commission, for, as stated, the necessity in view of the facts is obvious. It is plain that the maximum rate of fare chargeable by the Binghamton Railway Company under the statutes to which reference has been made is not only unjust and in fact, confiscatory, but is insufficient to yield reasonable compensation for the service rendered, and is unjust and unreasonable, and that, therefore, the commission should exercise its power in the premises and determine the just and reasonable rates, fares, and charges to be hereafter observed and in force as the maximum to be charged by said railway company for the service to be performed. This court is at liberty to recommend to its receiver that he respectfully request the fixing of a certain fare, inasmuch as such receiver is but the arm of the court itself.

This court, in view of the facts and existing conditions, which are liable to continue, and so far as human foresight can determine will continue for at least two years without substantial change, therefore authorizes and directs its receiver, William G. Phelps, to apply to the Public Service Commission, Second Division, for an increase of fare from 5 cents to 6 cents during the continuance of the war and for two years thereafter, and to incur the necessary expense of such application.

The following figures should be presented here, viz.:

Since 1914, the operating expenses of the Binghamton Railway Company, this defendant, have increased from $321,473.32 to $446,545.26 in 1917, an increase of $125,071.94.

During the first six months of 1918, such expenses increased $31,173.82 over such expenses for the first six months of 1917.

During the first six months of 1918, the revenues of this road decreased $27,525.36 as compared with the corresponding period of 1917.

During the first six months of 1918, the Binghamton Railway Company, this defendant, had a deficit of $18,748.27, as against a surplus of $60,682.27 for the corresponding period of 1917.

During the four years last past the taxes levied against the defendant company have been as follows: 1914, $16,200; 1915, $18,000; 1916, $21,000; 1917, $30,800; 1918, $41,255.65.

Due to advance in prices, the expenditures of the railroad company have increased from $28,263.27, in 1914, to $104,701.65, in 1917.

The defendant's necessary outlay for materials used in repairs is about $50,000 per year.

The defendant company has been under the necessity of making four increases in wages during the three years last past—the fourth increase in October, 1918.

The receiver appointed by this court took possession of the road on the 10th day of October, 1918. His receipts from operation of the road and lighting plant from October 10, 1918, to October 31, 1918, and his necessary disbursements for the bare expenses of running the road for the same period of time, were as follows:

Receipts.

| | |
|---|---|
| Cash on hand October 10, 1919................................. | $ 2,461.09 |
| Receipts, October 10 to October 31, 1918........................ | 27,229.63 |
| | $29,690.72 |

Disbursements.

| | | |
|---|---|---|
| Expenses of operation paid during and for same period.. | $25,291.14 | |
| Coal purchased and used, not paid for................. | 4,500.00 | 29,791.14 |
| Deficit ......................................................... | | $100.42 |

This is the result of keeping the road running for that period of 21 days.

There were no payments on interest on bonds or other obligations, taxes, insurances, or any existing indebtedness or claims for damages, or betterments, or necessary general repairs.

There are three sets of bonds outstanding against the Binghamton Railway Company secured by mortgage, viz.:

| | |
|---|---|
| On Binghamton, Lestershire & Union............................ | $ 147,000.00 |
|    Interest at 5 per cent. | |
| On Binghamton Railroad Company.............................. | 502,000.00 |
|    Interest at 5 per cent. | |
| On Binghamton Railway Company (first consolidation)............ | 1,813,000.00 |
|    Of these $68,000 are in escrow. | |
|    Interest at 5 per cent. | |
| The defendant owes for steel cars.............................. | 63,000.00 |
|    On car trust certificates. | |
| The note indebtedness of the defendant is....................... | 197,948.00 |
| It owes on open account....................................... | 76,691.13 |

The interest on the most of this indebtedness, and payable semi-annually, is past due.

It has been stated already that this financial condition has not resulted from waste, extravagance, overcapitalization, excessive salaries, or bad management. As heretofore stated, to continue to operate this road under present conditions at the present rates of fare, fixed by the statutes referred to, is impossible, as it will result in defaults on the mortgages and foreclosures.

[20] The rates now established and charged and chargeable *under such statutes* are also confiscatory. See the following authorities: Stone v. Farmers' Loan & Trust Co., 116 U. S. 307–331, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Dow v. Beidelman, 125 U. S. 680, 8 Sup. Ct. 1028, 31 L. Ed. 841–843; St. Louis & San Francisco R. Co. v. Gill, 156 U. S. 649, 15 Sup. Ct. 484, 39 L. Ed. 567; Cotting v. Godard, 183 U. S. 97, 22 Sup. Ct. 30, 46 L. Ed. 92; Detroit United Railway Co. v. City of Detroit, 245 U. S. 673, 38 Sup. Ct. 8, 62 L. Ed. 541, decided January 13, 1919.

In St. Louis, etc., v. Gill, supra, the court said:

"A state law, which establishes a tariff of rates so unreasonable as to destroy the value of the property of a railroad company, may be held to be unconstitutional, as taking property without due process of law. * * * As to whether a state law fixing the rates of fare requires a railroad company to do business at a loss and therefore constitutes a taking of its property without just compensation or due process of law, the correct test is the effect of the law on the entire line of such railroad."

There are phases of this matter to which I have not called attention, as I am of the opinion that the Quimby Case is intended by the Court of Appeals to hold that the Public Service Commission is without jurisdiction in any case to increase or decrease a rate of fare which has been agreed to by the enactment of a statute fixing the maximum rate of fare, and followed by the granting of a consent by the municipality to the construction and operation of the road, and which consent specifies the rate of fare to be charged, assuming, of course, that the contract made by such consent and the acceptance thereof, and by constructing and operating the road, has not been modified or abrogated by subsequent action or agreement, and also that it is immaterial to the question of jurisdiction whether or not such agreement or contract was subsequently ratified or approved by legislative action.

It ought to be the law, and I think it is the law, that when these several roads within the city of Binghamton became merged and consolidated pursuant to the general law into the Binghamton Railway Company, and extensions were thereafter made, all such contracts as I have mentioned were abrogated and annulled or became inoperative, and that thenceforth the rate of fare chargeable became that fixed by the general law. In this case it is claimed that some six or more valid contracts are in existence as to rates of fare on parts of this road, as now consolidated in one, and, if so, which is to control? Suppose all were substantially different as to rates of fare? The final consolidation resulting in the creation of this defendant, the Binghamton Railway Company, was effected December 6, 1901, under the pro-

visions of the general law then in force, and there have been numerous extensions of the lines since, consented to by the city.

The defendant, Binghamton Railway Company, then became bound under the provisions of that law, so far as the city of Binghamton was concerned, to conform to the rates of fare and provisions as to rates of fare fixed by and found in that statute and subsequent statutes, irrespective of any prior contract or contracts or agreement or agreements *as to rates of fare*. After such consolidation and extensions the company could not, in the city of Binghamton, operate all these consolidated roads and extensions as one road, and still charge and collect a fare of 5 or more or less cents for a continuous ride within the city on each of these roads as fixed and provided by the alleged contracts. Thereafter it was to charge a single fare, fixed by statute, *not by contract,* for a continuous ride over those lines within the city of Binghamton. The subsequent legislation is to the same effect as to rates of fare. So far as necessary the statutes on this subject have been quoted hereinbefore. To all this the city of Binghamton has assented. It has availed itself of the terms and benefits of the consolidation, and of the law under which made, and I think the alleged contracts have been abrogated by mutual consent. In Knox v. Lee, 12 Wall. 457, 550, 551, 20 L. Ed. 287, cited and approved in Louisville & Nashville R. R. v. Mottley, 219 U. S. 482, 31 Sup. Ct. 270, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, the Supreme Court said:

"Long before the above cases were decided it was said in Knox v. Lee, 12 Wall. 457, 550, 551 [20 L. Ed. 287], that, 'as in a state of civil society, property of a citizen or subject is ownership, subject to the lawful demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority.'"

It seems to me impossible to hold or find that any contract as to rates of fare now exists between the city of Binghamton and this railway company, or with either of the companies named, which interferes with the jurisdiction and power of the Public Service Commission to authorize the increased rate above suggested and recommended, which under the present circumstances and conditions is conservative.

There will be an appropriate order of authorization and direction to the receiver as to the roads where an increase is desired, such as is above indicated.